# United States Court of Appeals
## For the First Circuit

No. 09-2486

WILLIAM JEWETT, JR.,

Petitioner, Appellant,

v.

BERNARD F. BRADY, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

John H. Cunha, Jr., with whom Charles Allan Hope and Cunha & Holcomb, P.C. were on brief, for appellant.
Eva M. Badway, Assistant Attorney General, with whom Martha Coakley, Attorney General, was on brief, for appellee.

March 10, 2011

**LYNCH**, **Chief Judge**.  William Jewett, Jr., was convicted by a state court jury in November 1998 of the January 1993 rape and murder of a young woman to whom he offered a ride home after a party.  That conviction and the denial of his new trial motion in 2003 were affirmed on appeal by the Massachusetts Supreme Judicial Court ("SJC").  Commonwealth v. Jewett, 813 N.E.2d 452 (Mass. 2004).

Jewett appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which he claimed ineffective assistance of both trial and appellate counsel.  We affirm the district court, discussing the Supreme Court's recent opinion on claims of ineffective assistance of counsel in federal collateral attacks on state court convictions. See Harrington v. Richter, 131 S. Ct. 770 (2011).

I.

A.      The Underlying Crime

In federal habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); see also Evans v. Thompson, 518 F.3d 1, 3 (1st Cir. 2008).  We summarize the facts as described by the SJC in its opinion affirming Jewett's conviction and denial of new trial.  Jewett, 813 N.E.2d at 455-57.  Jewett does not contest the pertinent facts.

Jewett and the victim[1] had known one another socially for years but were not involved romantically. They both attended a party in Weymouth at the apartment of a mutual friend on the evening of January 29, 1993. At the time, Jewett was nineteen; the victim was seventeen. Sometime before 1:00 A.M., Jewett offered to drive the victim home. His car, which was seventeen years old, would not start, so a friend jump-started it and then followed along for a short period in the friend's truck. The two vehicles parted ways in a parking lot after Jewett said his car was fine, though it was backfiring and running noisily.

The victim had a 12:30 A.M. curfew, and when she did not arrive home by 1:00 A.M., her mother called the apartment where the party took place. The next morning, the victim's parents and friends began looking for her; when someone told her parents that the victim had left the party with Jewett, her father called Jewett. Jewett told the victim's father he had dropped her off at the end of her street in Weymouth at about 12:30 A.M. because she wanted to finish the beer she was drinking before going home.

A resident of Turner Road in neighboring Rockland discovered the victim's dead body on his property that afternoon, partially hidden in pine needles, twigs, and leaves. The state medical examiner noted at the scene:

---

[1] We use the term "the victim" to protect her privacy and the privacy of her family, just as the SJC and district court did.

-3-

> [T]he victim's lipstick was not smeared, but her blouse
> was pulled off her left shoulder, and two buttons in the
> middle of the blouse had been torn off. Her pants were
> buttoned, but the zipper was open and broken. One leg of
> her pantyhose had been torn completely off, and one of
> her boots was missing. Her underwear and pantyhose were
> rolled up, and she appeared to have been redressed.

Id. at 456. Her missing boot was later found in Weymouth, three-tenths of a mile from Jewett's home. Jewett was the last person known to have seen the victim alive.

The medical examiner determined that the victim had died at about 1:30 A.M., and that her body had probably been moved to Turner Road after her death. Autopsy results, based on observations of "scrapes, abrasions, and bruising to the victim's face and neck, as well as hemorrhages on the surface of her face and around her heart and upper airway," showed that the victim had been strangled to death by "a soft ligature, fingers, or a forearm." Id. at 456.

Semen recovered from the victim's underwear "revealed a high probability that it had come from [Jewett]," and Jewett could not be excluded as the source of the semen recovered from the victim's vagina, though analysis of that semen was inconclusive. Id.

Other evidence linked Jewett to the victim's rape and murder. Three residents of Turner Road testified at trial to seeing an automobile identical to Jewett's traveling down the road

-4-

with a single male occupant between 2:00 and 3:00 A.M. Two other residents heard an automobile backfiring at around the same time.

Jewett's friends testified that on the morning after the party, Jewett told them he "hoped nothing had happened" to the victim because "he did not have an alibi." Id. Friends also testified that for two days after the party, the defendant was "nervous," "pacing," and "agitated," and denied to them, as he did to the police, that he had ever had sexual intercourse with the victim (even after newspapers revealed the DNA test results). Id.

Jewett was indicted for rape and murder four years later, and while imprisoned awaiting trial, he confessed to Mark Obershaw, a fellow inmate, that he had raped and murdered the victim. The jury heard Obershaw testify to Jewett's confession. Jewett told Obershaw that the victim "refused at the last minute" to have sex with Jewett, "that he had sexual intercourse with her anyway, and that when he finished, the victim started yelling that he had raped her and that she was going to tell her father." Id. at 457.

Obershaw also testified that Jewett, after first telling Obershaw that the strangulation was an accident, later told him he "had to" strangle the victim to prevent rape charges. Id. He told Obershaw he then "put the body in the trunk and drove to a street where 'one of his best friends lived' because 'he knew a spot where he could put the body.'" Id.

B.          Jewett's Trial, Appeal, and Collateral Attack

Jewett did not testify at trial; his defense was that the victim had died of "positional asphyxiation" during consensual sex, and that he had disposed of her body in a panic after she died. Id. The defense at trial did not assert that there was anything more than this one sexual encounter between the two. The jury convicted Jewett of rape and first-degree murder by deliberate premeditation, and Jewett received a life sentence.

In May 2003, while his direct appeal to the SJC was pending, Jewett filed a motion in state court for a new trial raising, among other claims, three claims that are relevant to the present petition. First, he argued that certain evidence, described in greater detail below and provided to the defense before trial, showed that the sperm found in the victim's vagina was from twenty-four to thirty-six hours before death. This, he asserted, supported a theory that he and the victim had consensual sex. Jewett argued this evidence, which the defense did not use at trial, undermined the prosecution's theory that he committed the murder to cover up his rape of the victim. He argued the prosecution engaged in misconduct by depriving the jury of the evidence and presenting a state-employed chemist's testimony that he claimed the evidence impeached. Second, Jewett made a related argument that his trial counsel was ineffective in failing to develop and present to the jury this evidence that the sperm was

-6-

deposited twenty-four to thirty-six hours before death.  Third, he also argued that the trial court had erred in admitting physician opinion testimony that the victim had been sexually assaulted, an error not objected to at trial.

As to Jewett's two claims about the sperm age evidence, the SJC noted the testimony of the chemist, Mary McGilvray, regarding the two sperm samples recovered from the victim's body at about 11:00 P.M. on the day her body was found--one sample from her underwear, and one from her vagina.[2]  The samples apparently were taken at least twenty-two hours after the estimated time of death.

> [McGilvray] testified that none of the sperm cells in the two samples she examined "had tails."  She explained that an intact sperm cell consists of a head, neck, and tail, and that the tails are quite fragile, the first part of the sperm cell to degrade after it is deposited in the vagina.  She testified further that the presence of intact tails indicates that the sperm was deposited "more recently as opposed to a longer period of time," but that if no tails are present, she is unable to draw any conclusion about the age of the sperm.  McGilvray testified that, in addition to degradation over time, sperm tails can be shed by certain extraction techniques, such as the process used to recover the sperm cells from the victim's underwear.

Id. at 457-58 (footnote omitted).

The evidence that Jewett argued undermined McGilvray's testimony, thereby supporting his misconduct and ineffective assistance claims, consisted of two handwritten notes and a typed

---

[2]    The State Police Crime Laboratory report in the case, also prepared by McGilvray, did not include any discussion of the sperm samples other than to state that the sperm was present on vaginal swabs and the victim's underwear.

police report, all of which were hearsay.  The first handwritten note, which State Trooper Scott Berna testified at a 2008 deposition he wrote after a conversation with McGilvray,[3] reads in relevant part, "Fm chemist Mary Lumley [McGilvray's maiden name]--sexual contact of victim was approx. 24-30 hours prior to death (NOT LESS Than 24 hrs.)."  Berna testified that the note recounted what McGilvray said to him.

The second note was written by Richard Craig, a detective involved in the case who testified at his own 2008 deposition that he wrote the note based on a conversation with Berna.  The note reads, "Mary Lumley--old semen--(nite before, i.e., may have had sex Th--or Fri. afternoon.)"  Craig testified he never spoke directly with McGilvray about the information in the note.

Craig later wrote a typed report, which reads:

> Last night, Trp. Berna had advised me that he'd learned from the State Police Laboratory that while the post mortem did not reveal that she'd been raped, it did reveal that she'd had sex approximately 36 hours or so before death, because there were small amounts of sperm deep inside her vagina.  The lab also confirmed small deposits of 'old' sperm on her panties, which indicated she had changed her panties some time after the sexual encounter.  The lack of sperm, etc., on her body would be consistent with her having showered, as had been reported to us earlier.

---

[3]    As the SJC stated, Jewett, 813 N.E.2d at 458, both handwritten notes were unattributed; their authorship was determined through the depositions allowed by the federal district court.

Like his note, Craig's report was multiple hearsay, recounting what Berna had said he learned from McGilvray.

The SJC assumed arguendo that all of this evidence was admissible. Even so, it held that "in the context of the trial as a whole, a rational juror could not have considered it new, material, or helpful in any way, much less potentially 'dispositive.'" Jewett, 813 N.E.2d at 458. The SJC stated, "The three hearsay statements are inconsistent and ambiguous. They differ as to the estimate of the age of the sperm, and it is impossible to determine whether any of the notations concerning the time of sexual intercourse was attributable to McGilvrey [sic] or rather was the mere speculation of the author." Id. at 458. In addition, the SJC reasoned that the notes were not inconsistent with McGilvray's testimony, because they could be interpreted as saying that the sperm was deposited twenty-four to thirty-six hours before recovery from the victim's body, consistent with the prosecution's theory of intercourse near the time of death, see id. at 458 n.5, even though the notes referred to the age of the sperm at the time of death. Jewett did not take issue with this conclusion by the SJC in his brief to this court, but seized on it at oral argument. It is waived.

Further, the SJC reasoned, no other evidence corroborated a theory of consensual sex the day before the victim's death. To the contrary, friends had testified that Jewett and the victim were

not romantically involved prior to the night of the party. At trial, defense counsel did not so much as mention the possibility of previous consensual sex between Jewett and the victim. Id. at 458-59. The prosecutorial misconduct claim failed.

The SJC found that Jewett's claim of ineffective assistance of counsel related to this evidence consequently failed under its analogue to Strickland v. Washington, 466 U.S. 668 (1984), Commonwealth v. Saferian, 315 N.E.2d 878 (Mass. 1974). As to the question of whether counsel's performance was deficient, the SJC emphasized that trial counsel need not probe every inconsistency in the evidence, "particularly where the alleged inconsistency does not pertain to defense counsel's theory of the case" and where the evidence is not even arguably dispositive. Jewett, 813 N.E.2d at 458-59. As to the question of prejudice, the SJC found that use of the sperm age evidence at trial would not have made a material difference. The SJC held that, in the absence of any other evidence consistent with a theory of a sexual relationship between Jewett and the victim before the night of her murder, Jewett had presented no plausible alternate theory of the case based on the sperm age evidence. Id. at 459.

Addressing Jewett's claims of improper physician testimony, the SJC agreed with Jewett that under state law, experts may not opine on whether a rape has occurred where the jury is equally capable of making that determination on the evidence in the

-10-

case. Id. at 462. However, the SJC found the admission of the testimony had not "created a substantial risk of a miscarriage of justice," the standard applied to unpreserved claims of error, because there was sufficient other evidence on which a "rational jury" could base a conviction, including both the state of disarray of the victim's clothing when her body was found and Jewett's jailhouse confession. Id. at 463. It also reasoned that the defendant's conviction for first-degree murder suggested the jury rejected his defense theory of consensual sex, since there was no motive for purposeful killing other than covering up rape. Id. Finally, the SJC found the murder conviction was unaffected by the improperly admitted testimony, because it was based on other categories of evidence. Id.

Jewett's appellate counsel filed a petition for rehearing shortly after the SJC opinion was issued, arguing that appellate counsel's own failure on appeal to present a claim that trial counsel was ineffective in failing to object to the physician testimony was ineffective assistance of appellate counsel. The SJC denied rehearing.

Jewett filed this petition for habeas corpus in the federal district court, presenting two then-unexhausted claims of ineffective assistance of appellate counsel on direct appeal.[4] The

---

[4] Jewett also raised three other grounds for relief, but these were each either abandoned or procedurally defaulted, and he did not request a certificate of appealability on any of them.

-11-

district court stayed proceedings so that Jewett could pursue a second motion for a new trial in state court. In both cases, Jewett first argued that appellate counsel should have appealed the trial court's purported error in refusing to strike a seated juror who, distressed over the possibility of losing her job as a result of being absent for jury duty, asked rhetorically, "What if I say I automatically think he's guilty?" The trial judge explained that state law prohibited her employer from firing her for serving jury duty, and the juror returned to the jury room seemingly satisfied, but Jewett's trial counsel argued the juror could have been biased against him. Second, Jewett raised a claim based on appellate counsel's initial failure to raise a claim of ineffective assistance of trial counsel related to the improper physician testimony claim. In his federal petition, Jewett also pursued his claim of ineffective assistance of trial counsel related to the sperm age evidence.

The state trial court denied the new trial motion without a hearing, and, under the Massachusetts scheme governing review of first-degree murder convictions, a single "gatekeeper" justice of the SJC denied Jewett leave to appeal the denial to the SJC "for the reasons stated in the Commonwealth's opposition" to Jewett's motion for leave.

The federal district court allowed discovery relating to the sperm age evidence, including depositions of trial counsel,

-12-

McGilvray, and three law enforcement officers involved in the case. In an unpublished opinion, the district court held that the gatekeeper justice denied Jewett's claim relating to the juror on adequate and independent state procedural grounds. Jewett v. Brady, No. 05-11849, slip op. at 7 (D. Mass. Dec. 23, 2009). The court rejected Jewett's two other ineffective assistance claims on the merits. Id. at 15-18. Jewett requested a certificate of appealability on his three ineffective assistance of counsel claims, which the district court granted.

II.

To recount, we are reviewing on habeas three ineffective assistance of counsel claims, two as to appellate counsel and one as to trial counsel. Jewett's other claims in state court are not at issue here, but are discussed to the extent they relate to the ineffective assistance claims. Jewett argues that the SJC unreasonably applied the federal law governing his various ineffective assistance of counsel claims. He also states generally that the SJC made unreasonable factual determinations, but does not challenge any particular factual finding.

A.      Standards for Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), if a state court adjudicated a claim raised in a habeas corpus petition on the merits, its findings of law can be disturbed only if they were "contrary to, or involved an unreasonable

-13-

application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). "[S]ome increment of incorrectness beyond error is required" to establish an unreasonable application of federal law. McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)) (internal quotation marks omitted). State court findings of fact are "'presumed to be correct' unless the petitioner rebuts this 'presumption of correctness' with 'clear and convincing evidence.'" Yeboah-Sefah v. Ficco, 556 F.3d 53, 66 (1st Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

The clearly established federal law governing ineffective assistance of counsel claims is the framework established in Strickland. Williams v. Taylor, 529 U.S. 362, 390-91 (2000). On direct review under Strickland, a criminal defendant must show that his attorney's performance was deficient and that he was prejudiced--deprived of a fair trial--as a result. Strickland, 466 U.S. at 687. Massachusetts applies a "functional equivalent" to the Strickland deficiency standard, Lynch v. Ficco, 438 F.3d 35, 48 (1st Cir. 2006), which requires a "serious failure by trial counsel," Commonwealth v. Harbin, 760 N.E.2d 1216, 1219 (Mass. 2002), meaning a "serious incompetency, inefficiency, or inattention" that "has likely deprived the defendant of an otherwise available, substantial ground of defence," Saferian, 315 N.E.2d at 883. Reviewing courts "must indulge a strong presumption

-14-

that counsel's conduct falls within the wide range of reasonable professional assistance" and represents sound trial strategy. Strickland, 466 U.S. at 689.

The Supreme Court has recently reinforced the "doubly" deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the Strickland principles. In Harrington v. Richter, 131 S. Ct. 770 (2011), the Court reversed the en banc Ninth Circuit's decision to grant Richter's petition.[5] Id. at 780. "When § 2254(d) applies," the Court cautioned, "the question is not whether counsel's actions were reasonable." Id. at 788.

The Court explicitly emphasized two points. First, the "pivotal question" in a federal collateral attack under Strickland is not "whether defense counsel's performance fell below Strickland's standard," but "whether the state court's application

---

[5] The California Supreme Court had denied Richter's petition in a one-sentence summary order, which the Supreme Court held constituted adjudication on the merits for the purposes of 28 U.S.C. § 2254(d). Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011). The Supreme Court held there was "no merit" to the argument that the deferential review of § 2254 did not apply "because the California Supreme Court did not say it was adjudicating his claim 'on the merits.' The state court did not say it was denying the claim for any other reason. . . . [I]t may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. Jewett does not argue that the SJC failed to address any of his claims on the merits. We do not decide whether the rule of Fortini v. Murphy, 257 F.3d 39 (1st Cir. 2001), under which de novo review has been available in this circuit for habeas claims not expressly and individually addressed by a state court, survives Harrington.

-15-

of the Strickland standard was unreasonable," id. at 785, that is, whether "fairminded jurists" would all agree that the decision was unreasonable, id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)) (internal quotation mark omitted).  Second, the Strickland standard is a very general one, so that state courts have considerable leeway in applying it to individual cases.  Id.

The standard for habeas relief is "meant to be" difficult to meet, since federal habeas corpus review of state court decisions "is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Id. (quoting Jackson v. Virginia, 443 U.S. 307, 322 n.5 (1979) (Stevens, J., concurring in the judgment)).  AEDPA's high bar for relitigation of claims adjudicated in state courts "ensure[s] that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."  Id. at 787.

Another limit on federal habeas review is involved in this case as well.  A federal court will not consider a federal habeas claim "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Walker v. Martin, No. 09-996, 2011 WL 611627, at *6 (U.S. Feb. 23, 2011) (alteration in original) (quoting Beard v. Kindler, 130 S. Ct. 612, 614 (2009)) (internal quotation marks omitted).  Procedural default of federal claims in

-16-

state court is an independent and adequate state-law ground barring habeas relief, id.; see also Lynch, 438 F.3d at 44, so long as the state regularly follows the rule and has not waived it by relying on some other ground, Horton v. Allen, 370 F.3d 75, 80-81 (1st Cir. 2004).

These principles apply to Massachusetts state procedural rules. Under Massachusetts's plenary review scheme for first-degree murder convictions, Mass. Gen. L. ch. 278, § 33E ("section 33E") the SJC consolidates direct appeals with post-trial motions filed while the appeal is pending. The court engages in broad review of the entire trial record and can in theory sua sponte address issues overlooked by appellate counsel. See section 33E; Dickerson v. Latessa, 872 F.2d 1116, 1118 (1st Cir. 1989). But review by the full SJC of any later post-conviction motions denied by the trial court is available only if a single "gatekeeper" justice of the SJC determines that the appeal "presents a new and substantial question which ought to be determined by the full court." Section 33E. A determination by the single gatekeeper justice that the issues presented in an appeal are neither "new" nor "substantial" is an adequate and independent state-law ground precluding habeas relief when it rests on grounds of procedural waiver in the trial court. Simpson v. Matesanz, 175 F.3d 200, 206-07 (1st Cir. 1999). However, a determination that the issues are "new" and simply not "substantial" resolves the claims on the

merits and does not signal procedural default. Phoenix v. Matesanz, 189 F.3d 20, 25-27 (1st Cir. 1999). This means the gatekeeper's determination whether an issue is "new" is important for determining whether there are adequate and independent state grounds barring federal habeas relief.

The Commonwealth argues that the gatekeeper justice held that Jewett's two claims regarding appellate counsel were procedurally defaulted. The gatekeeper justice's opinion consisted of the single sentence: "The defendant's application pursuant to G.L. c. 278, s. 33E, for leave to appeal from the denial of defendant's motion for new trial, is denied for the reasons stated in the Commonwealth's opposition." That opposition, in turn, argued both that Jewett's claims were not new--because (1) the claim as to the improper physician testimony was just more argument on an already-litigated claim, and (2) the claim as to the juror was available on the SJC's plenary section 33E review because it was evident from the face of the trial transcript--and that in any event they were not substantial. Jewett replies that as a matter of logic he cannot have procedurally defaulted claims that appellate counsel was ineffective by failing to raise those claims on direct appeal.

The Commonwealth's procedural default argument boils down to the forceful claim that the section 33E scheme precludes federal habeas review whenever the gatekeeper justice finds that claims are

-18-

not "new" within the meaning of section 33E. This would bar federal review of both claims that could have been brought before but were not <u>and</u> claims that have already been brought. Thus, the Commonwealth argues, Jewett's ineffective assistance claim regarding the improper physician testimony is not "new" because, as the Commonwealth argued to the gatekeeper, it was belatedly raised and rejected on direct appeal. The Commonwealth also argues that the gatekeeper justice found Jewett's claim related to the unhappy juror to be not "new" because the SJC's plenary review under section 33E can be presumed to catch any serious error that is apparent from the trial transcripts.

The problem is that we do not know what the gatekeeper decided, since the gatekeeper relied on the "reasons" in the Commonwealth's opposition and those addressed both default and the merits of the claims. Because "[t]he 'independent and adequate state ground' doctrine is not technically jurisdictional" in habeas cases, <u>Lambrix</u> v. <u>Singletary</u>, 520 U.S. 518, 523 (1997), we bypass this issue and reach a decision on the merits, because these are "easily resolvable against the habeas petitioner, whereas the procedural-bar issue involve[s] complicated issues of state law," <u>id.</u> at 525. <u>See</u> <u>also</u> <u>Yeboah-Sefah</u>, 556 F.3d at 68 n.6 ("[B]ecause we easily reject petitioner's claim on the merits, we need not resolve th[e procedural default] dispute."); <u>Delaney</u> v. <u>Bartee</u>, 522

F.3d 100, 104 (1st Cir. 2008). The claims themselves are clearly without merit.

B.        Ineffective Assistance of Appellate Counsel

        1.      Juror Bias Claim

        It would have been reasonable for the gatekeeper justice to conclude, by adopting the reasoning in the Commonwealth's opposition, that appellate counsel reasonably could have decided that Jewett's claim relating to the juror was utterly meritless. The trial judge immediately resolved the issue, and had wide discretion over whether to excuse jurors. Counsel's choice to focus an appellate brief on the strongest claims, omitting weak claims, "might be considered sound . . . strategy." See Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted).

        2.      Physician Testimony Claim

        Jewett also pursues his claim that his appellate counsel was ineffective in failing to raise a claim on appeal that trial counsel was ineffective in failing to object to admission of improper physician testimony that the victim was sexually assaulted. The SJC agreed with Jewett on direct appeal that this evidence was improperly admitted, but found, as we have discussed, that its admission did not create a substantial risk of a miscarriage of justice, the standard applied by the SJC to unpreserved errors. Jewett, 813 N.E.2d at 463.

-20-

Jewett has not shown that it was unreasonable for the full SJC to reject his claim that without the improper testimony, his trial might have a different result, the predicate for his ineffective assistance of appellate counsel claim. Jewett's argument that the evidence of guilt apart from the improper physician testimony was weak is refuted by the SJC's summary of why that erroneous physician evidence would have made no difference. The SJC reasonably concluded that the murder conviction was based on evidence showing that Jewett was the last person to see the victim alive and had behaved strangely in the following days, that the victim had been strangled, that eyewitnesses had seen Jewett's car in the middle of the night in the area where the body was found, that Jewett had sexual intercourse with the victim shortly before her death, and that Jewett had confessed to Obershaw that he had killed her. See Jewett, 813 N.E.2d at 463. And the rape conviction was strongly supported by Jewett's unequivocal jailhouse confession, as well as by the disarray of the victim's corpse. See id. at 463.

Nor were the full SJC and the gatekeeper unreasonable in rejecting the claim of ineffective assistance of appellate counsel. The issue was briefed to the SJC on direct appeal, albeit belatedly, which court, we presume, found it to be without merit. See Harrington, 131 S. Ct. at 784-85 (stating that state court is

presumed to have denied a claim on its merits absent any signal to the contrary).

C.         <u>Ineffective Assistance of Trial Counsel: Sperm Evidence</u>

Finally, Jewett also argues that the SJC was unreasonable in rejecting his claim that trial counsel was ineffective in failing to develop and present to the jury a theory of the case based on the three notes he claims establish that the sperm found in the victim's underwear and vagina were deposited twenty-four to thirty-six hours before her death, rather than much closer to death as the prosecution's rape-murder theory required.  The SJC's decision rejecting this claim was reasonable.

Jewett argues that trial counsel should have used the sperm age evidence to impeach McGilvray, the state's chemist.  But as the SJC found, <u>Jewett</u>, 813 N.E.2d at 458, the three notes were themselves inconsistent as to when the sperm was deposited, with estimates ranging from "Fri. afternoon," or less than twelve hours before death, to "approximately 36 hours or so before death." Nothing in the notes established that there was a report by the state police lab stating that the sperm was deposited twenty-four or even twelve hours before death.  Nor was it clear that McGilvray herself, rather than Trooper Berna or Detective Craig, concluded that the sperm was deposited several hours before death.  The notes did not impeach the testimony of McGilvray, who in any event testified not that the sperm was deposited just before death, but

that because the sperm samples had no tails, "she [was] unable to draw <u>any</u> conclusion about the age of the sperm."  <u>Jewett</u>, 813 N.E.2d at 457 (emphasis added).

Jewett presents alternative theories of defense he says trial counsel could have argued based on the sperm age evidence, but he provides no evidence that he argued them to the SJC.[6]  In fact, both the SJC and the district court found Jewett had not adequately explained how the sperm age evidence would either support his positional asphyxiation defense or lead to any alternate theory that plausibly explained the evidence linking Jewett to the victim's death.  <u>Jewett</u>, No. 05-11849, slip op. at 12; <u>Jewett</u>, 813 N.E.2d at 459.

Finally, Jewett also argues that we need not defer to the SJC's evaluation of the sperm evidence because the depositions allowed by the federal district court "clarified the evidence." The decision to grant discovery for "good cause" is within the district court's discretion.  Rules Governing § 2254 Cases Rule 6(a); <u>Teti</u> v. <u>Bender</u>, 507 F.3d 50, 60 (1st Cir. 2007).  We think the issue is close in this case whether Jewett could show good

---

[6]    One alternate defense is the one Jewett maintained from the day after the murder to the beginning of trial, but not at trial: that he dropped the victim off at the end of her street, "alive and healthy."  The other defense keeps the positional asphyxiation defense presented at trial, adding the new claims that the two had consensual intercourse the day before, and that ejaculation did not occur the night of the victim's death, explaining the lack of newer sperm.

cause for discovery, because the deficiencies of the sperm age evidence are apparent from the face of the SJC's opinion. But whether the discovery was warranted or not, the district court itself noted, and after reviewing the record we agree, that the discovery "has not uncovered anything that would alter [the SJC's] analysis." Jewett, No. 05-11849, slip op. at 14-15.

Affirmed.