**Jeffrey BLY, Petitioner,**

v.

**Peter ST. AMAND, Respondent.**

**No. CIV.A. 08–10005–MLW.**

United States District Court,
D. Massachusetts.

Signed March 31, 2014.

Jeffrey Bly, Shirley, MA, pro se.

Pamela L. Hunt, Susanne G. Reardon, Office of the Attorney General, Boston, MA, for Respondent.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

## I. OVERVIEW

On September 25, 1995, Massachusetts Assistant Attorney General Paul McLaughlin was shot and killed. Petitioner Jeffrey Bly was charged with McLaughlin's murder. Bly was tried by jury in Suffolk Superior Court in May 1999. He was convicted and sentenced to life in prison.

Bly's conviction was affirmed by the Massachusetts Supreme Judicial Court (the "SJC"). Bly moved for a new trial. His motion was denied. He sought leave to appeal the decision denying him a new trial. His request for leave to appeal was denied as well.

Bly filed, in this court, a petition for habeas corpus under 28 U.S.C. § 2254 (the "Petition"). The Petition initially presented eight claims. On March 22, 2009, the court permitted Bly to amend his Petition to assert three additional claims.

For the reasons explained in this Memorandum, the Petition is being denied. The essence of these reasons is as follows.

First, the claims added to the Petition by way of amendment were considered by the Massachusetts courts and were found not to present "new and substantial" questions. Under First Circuit precedent, these claims are, therefore, procedurally defaulted. Bly does not satisfy any of the exceptions to the bar on procedurally defaulted claims. Accordingly, the court is not deciding the merits of these claims.

In the remaining claims asserted in the Petition, Bly argues that his rights were violated because: (1) unreliable DNA evidence was admitted at trial; (2) Bly was not provided with the complete set of data that supported calculations presented at trial concerning DNA evidence; (3) police officers retrieved a DNA sample from a water bottle that Bly had drunk from and from cigarettes that he had smoked during a police interview; (4) evidence was admitted at trial concerning Bly's refusal to enable the police to take a usable sample of his hair for DNA testing; (5) unreliable identification testimony was admitted at trial; (6) Bly's request to present expert testimony concerning the weakness of the identification testimony was denied; (7) the jury was not provided with an instruction concerning the weakness of "cross-racial" identification; (8) evidence was presented concerning certain prior bad acts committed by Bly; (9) Bly's pretrial request to obtain the medical records of one of the prosecution's witnesses was denied; and (10) the trial court denied Bly's motion to suppress evidence concerning an interview conducted with Bly by the police before Bly was given Miranda warnings.

These ten claims are being considered on their merits. However, none of these claims establishes that any state court decision was contrary to clearly established federal law, represented an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. Bly's array of claims does not, therefore, support habeas relief.

## II. BACKGROUND

### A. The Crime and the Trial

Just before 7:00 p.m. on September 25, 1995, McLaughlin was shot and killed at the Highland Street commuter rail station in West Roxbury, Massachusetts. McLaughlin was scheduled to begin trying a criminal trial against Bly the following morning. Bly was to be tried for an attempted carjacking perpetrated against Dana Alston. During the previous eight months, McLaughlin had prosecuted two other cases against Bly, both of which had resulted in verdicts of not guilty.

Bly was indicted for McLaughlin's murder on February 19, 1998. He was tried by jury in Suffolk Superior Court in May, 1999. Some of the key pieces of evidence presented at trial were the following.

Four of Bly's acquaintances testified about the events leading up to the night of McLaughlin's death—Eric Hardy, Anthony Houston, Sandra Brown, and Mario Thompson.

Hardy testified that he and Bly belonged to a group of young men who "hung out" in the Theodore Street area. According to Hardy, about one week before Bly's carjacking trial was scheduled to begin, Bly told Hardy that he was concerned about the trial, that he "got to do something," but that he "can't mess with Dana

[Alston]." Bly then "popped up like 'I got it,'" and took his friend Ricardo Gittens aside for a private conversation. *See* 6 Trial Tr. 79.

Houston, another member of the Theodore Street group, testified that on September 22, 1995, three days before McLaughlin's death, he went with Bly to downtown Boston. At Boston's South Station, Bly pointed McLaughlin out to Houston and instructed Houston to follow McLaughlin and to "find out where he goes, does he meet up with anybody, where he gets off at, anything in that nature." Houston followed McLaughlin on to the train, off the train at the Highland Street station, and to McLaughlin's car. Houston attempted to write down McLaughlin's license plate number. He then returned to Theodore Street and shared his findings with Bly. *See* 6 Trial Tr. 15.

Brown testified that on the afternoon of September 25, 1995, the day of the shooting, she overheard a conversation between Bly and several of his friends. Brown heard Bly state that he "had to get the prosecutor" and that it would "have to be done tonight." Bly was almost certainly wearing a black hooded sweatshirt, black jeans, and black sneakers. *See* 5 Trial Tr. 86–87.

Thompson testified that on the same afternoon, Bly asked Thompson to follow Bly by car. Bly, who was wearing black jeans, a black sweater, and a black "toboggan" (knit cap), rode in another car along with Gittens. Bly, Gittens, and Thompson drove to a lot across the street from the Highland Street station. Bly then told Thompson that he was not needed and that he could leave. *See* 5 Trial Tr. 162–63.

Several witnesses who did not know Bly testified about the events at Highland Street Station on September 25, 1995. Particularly significant testimony was provided by Michael Duffy and Maureen Woodsum.

Duffy testified that on that day, his car was parked about thirty yards behind McLaughlin's car. Duffy arrived at the Highland Street station at approximately 6:50 p.m. He saw McLaughlin walking to his car. Duffy then heard two shots. He looked up and saw a person leaning into the driver's side of McLaughlin's car. Duffy described that person as a black male, 14–16 years old, wearing a black hooded sweatshirt and baggy jeans. *See* 6 Trial Tr. 132.

Woodsum testified that she drove by the Highland Street station on her way home at about 6:00 p.m. on the evening of the shooting. She saw a man she did not know standing near the station, wearing dark pants, a dark hooded sweatshirt, and a dark cap. Twenty-seven months later, in February 1998, Woodsum saw the man she had seen that night on a television news broadcast. The man was shown appearing in court next to another man, whom Woodsum had known in high school. Woodsum then learned that the broadcast concerned Bly's indictment for McLaughlin's murder. *See* 5 Trial Tr. 14–18.

Brown, Hardy, Houston, and Thompson, as well as Brown's mother, gave additional testimony about Bly's actions and words subsequent to McLaughlin's death.

Brown testified that she saw Bly again later the same evening. She noticed that he was soaking his hands in bleach and that he was no longer wearing his black hooded sweatshirt. Brown heard Bly say that "doesn't have any worries" and that he "doesn't have a prosecutor." *See* 5 Trial Tr. 88.

Sandra Brown's mother, Janet Brown, testified that she saw Bly at her sister's apartment, where Sandra lived as well, on that same night. Bly told Janet that he

"don't have to worry no more," that he "took care of [his] problem." He explained that he had waited in the bushes and had shot McLaughlin two or three times. When Janet asked Bly why he had done so, he responded that he "didn't want to go back to prison" and that McLaughlin "was going to give him a lot of time because he had been up against him before and ... had lost both cases." *See* 5 Trial Tr. 205–06.

Hardy, too, testified that Bly told him he had killed McLaughlin. This conversation occurred on the day after the shooting. According to Hardy, Bly said that he had waited for McLaughlin in the bushes near McLaughlin's car, that he had shot McLaughlin twice, and that he had fled to Gittens's waiting car, discarding his blood-spattered sweatshirt and bandana as he ran. Bly explained that McLaughlin was "going to give [Bly] life on a carjacking case," and that Bly could now "buy [himself] some more time to be out and ... get a different D.A." Subsequently, Bly asked Hardy to "get rid" of Gittens's car. Bly also threatened to kill Hardy if he "snitch[ed]." *See* 6 Trial Tr. 82–84.

Houston testified that he saw news reports about the murder and recognized McLaughlin as the man Bly had instructed him to follow. Houston confronted Bly, and Bly told him, "[D]on't say nothing." Bly instructed Houston to "[s]tay away from Theodore [Street] because it was going to be hot," and to say, if questioned, that Bly had never asked him to follow McLaughlin. *See* 6 Trial Tr. 24–25.

Thompson, too, testified that he saw news reports about McLaughlin's death, and that he recognized the crime scene as the area that Bly had led him to that night. Thompson questioned Bly about the murder, and Bly told him to tell anyone who asked that the two men had been together that night. *See* 5 Trial Tr. 166–68.

Police investigators found a black hooded sweatshirt, a pair of gloves, a green bandana, and a knit cap in the vicinity of the Highland Street station. Additional testimony presented at trial concerned DNA testing performed on genetic material extracted from these articles of clothing. Tests were performed by three separate laboratories. First, a laboratory named CBR examined several blood stains identified on the garments and found a match between these stains and McLaughlin's DNA. Next, the FBI's laboratory ran tests using DNA from McLaughlin, Bly, and two additional suspects. The FBI determined that the DNA on the bandanna and on the right glove matched McLaughlin's DNA. It also found that Bly could not be excluded as a potential contributor to samples extracted from seven different locations on the garments, but that the other two suspects could be excluded from all of those samples. *See* 10 Trial Tr. 99–100; 11 Trial Tr. 101.

The third laboratory to perform testing was Bode Technology Group ("Bode"). Bode performed two sets of tests that compared Bly's DNA with DNA extracted from the collar of the sweatshirt found by Highland Street station. In its case-in-chief, the prosecution presented testimony only about the results of the first set of tests, conducted in December 1998. This set of tests returned interpretable results at five of the eight genetic locations that were tested. These results indicated that the material extracted from the sweatshirt matched Bly's DNA, and that the DNA pattern shared by Bly and the tested sample appears at random in one out of 631,-000 African Americans. *See* 12 Trial Tr. 53. The defense's cross-examination of Bode's representative, Dr. Kevin McElfresh, elicited testimony about the second set of tests, performed in January 1999. The second set of tests yielded results at

all eight genetic locations, and again found a match between the sweatshirt and Bly's DNA. However, as discussed below, the second set of tests suffered from certain methodological shortcomings.

On May 29, 1999, the jury returned a guilty verdict. Bly was sentenced on the same day to life in prison.

### B. Subsequent Proceedings

Bly appealed his conviction to the SJC. He argued on appeal that:

(1) the trial judge wrongly admitted certain [DNA] test result evidence; (2) DNA evidence collected from a water bottle and cigarette butts used by Bly should have been suppressed; (3) Bly's statement to the police, obtained without Miranda warnings, should have been suppressed; (4) identification testimony by one of the Commonwealth's witnesses should have been suppressed; (5) Bly's expert on identification should have been permitted to testify before the jury; (6) evidence of Bly's refusal to provide a court-ordered hair sample should not have been heard by the jury; (7) the judge wrongly admitted testimony regarding prior bad acts by Bly; and (8) the medical records of one of the Commonwealth's witnesses were not produced to Bly in a timely manner or found to be privileged in a written decision by the judge.

*Commonwealth v. Bly*, 448 Mass. 473, 862 N.E.2d 341, 346 (2007). After examining the merits of these arguments in detail, the SJC affirmed Bly's conviction.

On January 3, 2008, Bly filed the Petition. The claims Bly initially presented corresponded to his arguments before the SJC on appeal.

On May 27, 2008, Bly moved in state court for a new trial. That motion was denied on July 30, 2008. Bly then petitioned the SJC, pursuant to Massachusetts General Laws ch. 278, § 33E, for leave to appeal the trial court's decision denying his motion for a new trial.

On October 9, 2008, while his petition for leave to appeal was pending, Bly moved in this court to submit a supplemental memorandum in support of the Petition (the "Motion to File"). Bly's proposed supplemental memorandum addressed both the claims originally asserted in the Petition and the grounds upon which Bly had moved for a new trial in state court. Bly also requested a stay of the proceedings on the Petition in order to exhaust the claims that were pending in the SJC.

On November 25, 2008, Justice John M. Greaney of the SJC denied Bly's application for leave to appeal. That decision mooted Bly's request for a stay of the proceedings on the Petition.

On March 22, 2009, the court ordered that Bly's Motion to File would be construed not only as a motion to file the supplemental memorandum, but also as a motion to amend the Petition to assert the additional claims discussed in the supplemental memorandum. The court determined that the Motion to File had been submitted within the one-year period of limitation that governs § 2254 habeas petitions, because part of the period of limitation had been tolled while Bly's post-conviction proceedings were pending in state court. The court, therefore, allowed the Motion to File and deemed the Petition amended. *See* Mar. 22, 2009 Mem. & Order 4. The parties submitted supplemental briefing.

### III. THE CLAIMS ADDED BY AMENDMENT ARE PROCEDURALLY DEFAULTED

#### A. Legal Standard

██ A federal habeas claim will not be considered if the state court decision

that it challenges "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Jewett v. Brady*, 634 F.3d 67, 76 (1st Cir.2011) (quoting *Walker v. Martin*, — U.S. —, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011)); *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Procedural default is considered to be an "independent and adequate state ground" for a judgment if the state consistently applies the procedural rule in question and has not waived that rule by relying on other grounds. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Jewett*, 634 F.3d at 76. A habeas court should consider whether a petitioner's claims have been procedurally defaulted before it reaches the merits of those claims. *See Lambrix v. Singletary*, 520 U.S. 518, 524, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Lynch v. Ficco*, 438 F.3d 35, 47 n. 10 (1st Cir.2006).

■■■ The bar on habeas consideration of procedurally defaulted claims is removed "[i]f the last state court to be presented with a particular federal claim reaches the merits." *Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Phoenix v. Matesanz*, 189 F.3d 20, 25–26 (1st Cir.1999). In addition, a procedurally defaulted claim may be considered on its merits if the prisoner can demonstrate: (1) "cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law," *Maples v. Thomas*, — U.S. —, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (quoting *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546); or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546.

**B. *Additional Detail***

The court permitted Bly to amend his Petition to add the following claims:

First, Bly argues that the prosecutor made improper remarks in his closing statement. According to Bly, the prosecutor misstated evidence, vouched for prosecution witnesses, and attacked Bly's character. Relatedly, Bly argues that his trial counsel was ineffective for failing to object to these elements of the prosecutor's closing statement.

Next, Bly challenges certain jury instructions given by the trial court. He argues that it was improper for the trial court to instruct the jury that "malice aforethought," an element of the Massachusetts murder offense, may be inferred from the use of a weapon capable of inflicting grave bodily harm. He also challenges the trial court's instruction that a "murderous frame of mind" constitutes malice aforethought. Finally, Bly argues that it was improper for the trial court to instruct the jury that the injuries inflicted on the victim may be considered as indications of "deliberate premeditation," an element of first-degree murder in Massachusetts. Again, relatedly, Bly contends that his trial counsel's failure to object to this jury instruction amounted to ineffective assistance. Bly adds that his appellate counsel was ineffective for failing to address this issue on appeal.

Bly first asserted these claims in his motion for a new trial. When that motion was denied, he presented the claims to the SJC in his petition for leave to appeal under Massachusetts General Laws ch. 278, § 33E. As explained below, the denial of these claims under § 33E renders them procedurally defaulted. Consequently, they cannot be considered in habeas proceedings unless one of the exceptions to the bar on procedurally defaulted claims is

satisfied. In the current case, these exceptions do not apply.

### C. *Procedural Default Under § 33E*

■■■ Section 33E provides that an appeal may be taken from a decision denying a motion for a new trial only if a single justice of the SJC determines that the appeal "presents a new and substantial question which ought to be determined by the full court." A question is "new" only if it could not have been "addressed at trial or on direct review, had the defendant properly raised it there." *Yeboah–Sefah v. Ficco*, 556 F.3d 53, 74 (1st Cir.2009). A question is "substantial" if it is "meritorious ... in the sense of being worthy of consideration by an appellate court." *Commonwealth v. Gunter*, 459 Mass. 480, 945 N.E.2d 386, 392 (2011). On another formulation, a question is "substantial" if it "offers some reasonable possibility of a successful decision in the appeal." *Commonwealth v. Hodge*, 380 Mass. 851, 406 N.E.2d 1010, 1014 (1980) (quoting *Commonwealth v. Allen*, 378 Mass. 489, 392 N.E.2d 1027, 1033 (1979)).

■■■ Section 33E has been applied by the Massachusetts courts with sufficient consistency to qualify as "an adequate and independent bar to collateral relief." *Mendes v. Brady*, 656 F.3d 126, 130 (1st Cir.2011); *Yeboah–Sefah*, 556 F.3d at 75. Moreover, while a claim may be addressed in habeas proceedings if the last state court to decide it reached the merits, the First Circuit has held that a finding under § 33 that a claim is not "substantial" is not a decision that reaches the merits:

> The Single Justice's finding that neither of [the petitioner's] ... claims presented "new and substantial questions" within the meaning of § 33E review constitutes an independent and adequate state ground.... The Single Justice's finding of a lack of substantiality constitutes an

independent and adequate state ground in and of itself and acts to bar federal review.

*Costa v. Hall*, 673 F.3d 16, 24 (1st Cir. 2012). Therefore, under *Costa*, "a § 33E gatekeeper justice's finding either that a claim is 'not new' or that justice's finding that a claim is 'not substantial' would separately 'constitute[ ] an independent and adequate state ground in and of itself and acts to bar federal review.'" *Souza v. Mendonsa*, Civ. A. No. 12–10705–DPW, 2013 WL 4517978, at *5 (D.Mass. Aug. 23, 2013) (alteration in original) (quoting *Costa*, 673 F.3d at 24).

Decisions by Judge Douglas P. Woodlock and by this court have noted a tension between *Costa* and prior First Circuit decisions. *See Souza*, 2013 WL 4517978, at *5 n. 3; *Lee v. Corsini*, Civ. A. No. 07–11316–MLW, 2013 WL 6865585, at *11 n. 7 (D.Mass. Dec. 24, 2013); *Sullivan v. Duval*, Civ. A. No. 96–12046–MLW, slip op. at 42–43, 2014 WL 1247894 (D.Mass. Mar. 24, 2014). Nevertheless, the court is required to apply the more recent holding of *Costa*, which is clear and unqualified.

■■■ In the current case, the single justice denied Bly's application "for the reasons stated in the Commonwealth's opposition" to Bly's application for leave to appeal. SJC Case No. SJ–2008–0392, Docket No. 9. The Commonwealth had argued that Bly's application raised "no new and substantial issue warranting review by the full court." Comm.'s Opp'n to Pet. for Leave to App. 2. In essence, therefore, the single justice determined that Bly's arguments for a new trial are not "new and substantial questions" for the purposes of § 33E review. Under *Costa*, 673 F.3d at 24, this finding constitutes an independent and adequate state ground that bars federal habeas review.

D. *Exceptions to the Bar on Procedurally Defaulted Claims*

Bly's procedurally defaulted claims may be considered on their merits if Bly establishes one of the following exceptions: (1) cause for his default, in addition to actual prejudice resulting from the alleged violation of federal law; or (2) a fundamental miscarriage of justice that would result from failure to consider his claims. *See Maples,* 132 S.Ct. at 922; *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. Neither exception applies.

■ First, there is no indication that Bly's procedural failings are excused by any "cause." Bly argues, in a reply brief, that he "did not fail to meet the State's procedural requirements for filing his state collateral attack because he had no set pre-conditions for filing the motion." Pet'r's Reply to Resp.'s Suppl. Mem. 4. However, the procedural lapse that must be excused by a showing of "cause" is Bly's failure to present his current arguments "on direct review." *Yeboah–Sefah,* 556 F.3d at 74. Bly does not suggest that there was any justification for this failure.

■ Nor can Bly's claims that he received ineffective assistance from his trial and appellate counsel provide, on their own, the requisite "cause" for Bly's procedural default. Bly's claim to ineffective assistance of trial counsel was first raised in his state post-conviction proceedings. It was denied in the single justice's decision under § 33E. Thus, this claim has, itself, been procedurally defaulted. "Federal habeas courts do not exempt ineffective assistance of counsel claims from the general rule requiring cause and prejudice for procedural default, because to do so would render the exhaustion requirement 'illusory.'" *Costa,* 673 F.3d at 25 (quoting *Edwards v. Carpenter,* 529 U.S. 446, 452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000)). Rather, "[c]ause for procedural default

'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Bly makes no suggestion that any such "objective factor" played in a role in the course of his litigation.

The same requirement for an "objective factor external to the defense" applies where "the petitioner attempts to excuse procedural default of his ineffective assistance of counsel claim by pointing merely to another layer of ineffectiveness." *Id.* As a result, Bly's contention that his appellate counsel rendered ineffective assistance is also not exempt from the "cause" requirement. This contention cannot, therefore, salvage Bly's claim that he received ineffective assistance of trial counsel. By extension, it cannot rescue any other procedurally defaulted claims.

■ Because the "cause" element is not satisfied in this case, a determination of whether Bly has suffered prejudice as a result of any alleged violation of federal law is not necessary or appropriate. The Supreme Court has "expressly rejected [the] contention that a showing of actual prejudice 'should permit relief even in the absence of cause.'" *Murray,* 477 U.S. at 494, 106 S.Ct. 2639 (quoting *Engle v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). "In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism." *Coleman,* 501 U.S. at 730, 111 S.Ct. 2546; *Lambrix,* 520 U.S. at 523, 117 S.Ct. 1517. An inquiry into the "prejudice" element would, therefore, gratuitously undermine the concepts of federalism and comity that underlie habeas re-

view. Such an inquiry is, therefore, not appropriate.

In the absence of "cause" and "prejudice," the merits of Bly's procedurally defaulted claims may be reached only if failure to address these claims would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. This exception to the bar on procedurally defaulted claims is " 'rare' and [is] only . . . applied in the 'extraordinary case.' " *Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting *Murray,* 477 U.S. at 494, 106 S.Ct. 2639). The Supreme Court has "explicitly tied the miscarriage of justice exception to the petitioner's innocence." *Id.* The term "innocence" in this context refers to "factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "The miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].' " *McQuiggin v. Perkins,* —— U.S. ——, 133 S.Ct. 1924, 1933, 185 L.Ed.2d 1019 (2013) (quoting *Schlup,* 513 U.S. at 329, 115 S.Ct. 851). Bly does not appear to contend that he is factually innocent. In any event, he does not present new evidence that shows it is more likely than not that no reasonable juror would have convicted him. The "miscarriage of justice" exception does not apply, therefore, and the court is not reaching the merits of Bly's procedurally defaulted claims.

## IV. THE REMAINING CLAIMS ARE NOT MERITORIOUS

### A. *Legal Standard*

A federal court presented with a habeas claim under 28 U.S.C. § 2254 must determine whether the state courts' adjudica-tion of the petitioner's case: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *DeBurgo v. St. Amand,* 587 F.3d 61, 67 (1st Cir.2009); *Foxworth v. St. Amand,* 570 F.3d 414, 425 (1st Cir.2009).

A state court decision is "contrary to" clearly established federal law if the state court applies a legal rule that contradicts the holdings of the Supreme Court, or if the court confronts facts that are materially indistinguishable from those presented in a Supreme Court decision and reaches a different result. *See Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Gaskins v. Duval,* 640 F.3d 443, 451–52 (1st Cir.2011). "[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably with [the] 'contrary to' clause." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495.

A state court decision involves "an unreasonable application of" clearly established federal law if: (1) "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) "the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495. Under the "unreasonable application" prong of

§ 2254, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state–court decision applied clearly established federal law erroneously or incorrectly." *Id.* Rather, relief may only be granted when that application was also "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495; *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011); *Jewett*, 634 F.3d at 74–75.

In evaluating habeas claims, the federal court must rely on the facts found by the state courts, supplemented with other facts from the record that are consistent with the state courts' findings. *See Lynch*, 438 F.3d at 39. The court must presume that the state court's factual determinations are correct unless the petitioner rebuts this "presumption of correctness" with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir.2000); *DeBurgo*, 587 F.3d at 62. This presumption of correctness applies to factual findings made by both the state trial court the state appellate court. *See Teti v. Bender*, 507 F.3d 50, 58 (1st Cir.2007).

### B. DNA Testing: Reliability (Ground One, First Component)

Bly's first non-defaulted claim is that the trial court permitted the prosecution to introduce unreliable evidence concerning DNA testing at trial. The DNA testing that Bly challenges as unreliable is the testing conducted by Bode. Bly focuses, first, on the second of Bode's two sets of DNA tests. He argues that this set of tests suffered from two methodological deficiencies: First, it produced findings that, according to the defense, indicated that the

genetic material used by Bode had been contaminated.[1] Second, a process known as "reamplification" was used in this second set of tests. Reamplification increases the likelihood of contamination, and it also indicates that the sample of DNA being used is very small. In addition to these methodological issues, Bly contends that Bode's calculations concerning the incidence of the DNA patterns it identified were unreliable. More specifically, he argues that Bode erroneously used a combination of two separate databases, one compiled by Bode itself and one compiled by a different laboratory, Promega.

Bly's arguments on this issue are not based on federal law. The evidentiary standards applied at trial and by the SJC were doctrines of Massachusetts evidentiary law. *See* Apr. 29, 1999 Tr. 2–12; *Bly*, 862 N.E.2d at 351–52 (citing *Commonwealth v. Gaynor*, 443 Mass. 245, 820 N.E.2d 233 (2005); *Sullivan v. Boston Elevated Ry.*, 224 Mass. 405, 112 N.E. 1025 (1916)); *see also Milone v. Camp*, 22 F.3d 693, 698, 703 (7th Cir.1994) ("The admissibility of evidence is generally a matter of state law.").

Bly does cite *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in support of his claim. *See* Pet'r's Mem. 25. However, *Daubert* interprets the law of evidence that governs federal court proceedings. *See* 509 U.S. at 588, 113 S.Ct. 2786 (discussing Federal Rule of Evidence 702). It is not applicable to state–court proceedings. Although the SJC has adopted "the basic reasoning of the *Daubert* opinion because it is consistent with [the SJC's] test of demonstrated reliability," *Commonwealth v. Lanigan*, 419 Mass. 15, 641

---

1. Dr. McElfresh, Bode's representative, interpreted these findings as non-significant "arti-

facts." *See* 12 Trial Tr. 70.

N.E.2d 1342, 1350 (1994), this holding, too, is a doctrine of state law. *See Arroyo v. Brady*, Civ. No. 05–11277–DPW, 2006 WL 962151 (D.Mass. Apr. 11, 2006); *Robinson v. St. Amand*, Civ. No. 08–11535–RGS, 2010 WL 1257978 (D.Mass. Mar. 15, 2010), report and recommendation adopted, 2010 WL 1257979 (D.Mass. Mar. 29, 2010). "[A] state cannot expand federal jurisdiction by deciding to copy a federal law. If it incorporates federal law into state law and then gets the federal law wrong, it has made a mistake of state law, which cannot be a basis for federal habeas corpus." *Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir.1999) (citation omitted). Thus, in essence, Bly's argument concerning the reliability of Bode's testing involves no applicable rule of federal law that might have been contravened or applied unreasonably by the state courts.

■ Because Bly is a *pro se* litigant, his pleadings must be construed liberally. *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Instituto de Educacion Universal Corp. v. U.S. Dept. of Ed.*, 209 F.3d 18, 23 (1st Cir.2000); 17B Charles Alan Wright et al., *Federal Practice and Procedure* § 4268.3 (3d ed. 2010) ("Surely pro se habeas corpus petitions should be viewed by the courts with the greatest liberality, and this is the practice of the courts."). A challenge, like Bly's, to the reliability of evidence introduced at trial may be crafted as an argument that the defendant was denied constitutional due process. *See Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir.2000); *Crouse v. Dickhaut*, Civ. A. No. 07–12004–MLW, 2013 WL 1054845, at *10–*11 (D.Mass. Mar. 13, 2013). For the following reasons, however, Bly would not benefit from an effort to interpret his claim as a due process argument.

■ Habeas relief is generally unavailable unless the petitioner "has exhausted the remedies available in the courts of the State." § 2254(b)(1)(A).[2] In order to exhaust a claim, "the petitioner must 'present the federal claim fairly and recognizably' to the state courts, meaning that he 'must show that he tendered his federal claim in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'" *Clements v. Maloney*, 485 F.3d 158, 162 (1st Cir.2007) (quoting *Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir. 2000)).

■ On the subject of the reliability of the DNA evidence admitted against him, Bly did not indicate in the state courts that he intended to assert a federal claim. *See* Br. for Def./Appellant on App. 35–44 ("Bly App. Br."). Consequently, if Bly's attack on Bode's DNA evidence were to be construed as a federal claim, it would be an unexhausted one. The court would not be permitted to grant relief on the basis of this unexhausted claim. Moreover, "mixed petitions" presenting both exhausted and unexhausted claims are subject to dismissal in their entirety. *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *DeLong v. Dickhaut*, 715 F.3d 382 (1st Cir.2013); *Clements*, 485 F.3d at 168–69. As a result, an interpretation of Bly's argument concerning the reliability of Bode's testing would, rather than benefitting Bly, jeopardize his entire Petition.

■ The court would be permitted to stay the proceedings on the Petition in order to permit Bly to exhaust his unex-

---

**2.** Exhaustion of state court remedies is not required if "there is an absence of available State corrective process" or if "circumstances exist that render such process ineffective to protect the rights of the applicant." § 2254(b)(1)(B).

hausted claim if Bly "had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that [he] engaged in intentionally dilatory litigation tactics." *Rhines v. Weber*, 544 U.S. 269, 278, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005); *Josselyn v. Dennehy*, 475 F.3d 1, 4 (1st Cir. 2007). There is, however, no indication that there was "good cause" that prevented Bly from asserting a federal claim concerning the reliability of Bode's testing before the state courts. A stay would be inappropriate for this reason alone. *See Clements*, 485 F.3d at 171. In addition, in order for a due process attack on evidence presented at trial to be "potentially meritorious," it would need to demonstrate a "denial of fundamental fairness." *Brown*, 227 F.3d at 645; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). It does not appear that Bly's challenges to the reliability of the DNA evidence admitted by the trial court could satisfy this standard.

The court, therefore, is not interpreting Bly's argument against the reliability of Bode's DNA testing as a federal claim. As an argument based solely on state law, this claim cannot support habeas relief.

### C. *DNA Testing: Withheld Material (Ground One, Second Component)*

Bly asserts another argument concerning the DNA testing admitted at trial. He contends that his rights were violated because the prosecution did not produce to him the entire database that Bode used to calculate the incidence of the DNA pattern it found in Bly's blood and on the sweatshirt it examined. Bly moved before trial for discovery of this database, with the stated intention of challenging the database's reliability through expert analysis. The trial court denied Bly's motion after Bode represented that the cost of repro-

ducing the database would be $250,000. *See* Apr. 6, 1999 Tr. 57–58.

This claim relies on the federal constitutional standard defined by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It was properly exhausted in its federal form in the state courts, and may be addressed on the merits.

 "To establish a *Brady* violation, a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)." *Conley v. United States*, 415 F.3d 183, 188 (1st Cir.2005) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The third of these elements, prejudice, occurs where " 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*, 527 U.S. at 289–90, 119 S.Ct. 1936 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *United States v. Josleyn*, 206 F.3d 144, 152 (1st Cir.2000). The decisive inquiry presented by the prejudice prong is whether in the absence of the undisclosed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

The SJC examined Bly's complaint about the prosecution's alleged failure to produce Bode's database under the corresponding state law standard. First, the SJC examined whether the database was "potentially exculpatory," and found that it was. *See* 862 N.E.2d at 353. The SJC then explained that:

Where a defendant's specific discovery request goes unmet, we have outlined a standard of prejudice favorable to the defendant. Bly need only show that "a substantial basis exists for claiming prejudice from the nondisclosure." This threshold can be met with record support for the conclusion that the jury would have been influenced by timely disclosure of the evidence in question.

*Id.* (quoting *Commonwealth v. Healy,* 438 Mass. 672, 783 N.E.2d 428 (2003); *Commonwealth v. Tucceri,* 412 Mass. 401, 589 N.E.2d 1216 (1992)).

▮ The SJC explained that Bly did not demonstrate a "substantial basis for claiming prejudice" because "there were alternative methods of attacking the reliability of the database," particularly a comparison of "the over-all results of the Bode database to other, peer-reviewed databases." *Id.* Bly had, in fact, presented expert evidence at trial to the effect that Bode's database produced incidence rates somewhat different from the rates produced by Promega's database. *See* 14 Trial Tr. 21–24. He continued to attack the reliability of Bode's database, primarily on this ground, on appeal. *See* Bly App. Br. at 44–45. The SJC determined that "[i]n light of Bly's current attack on the Bode database and his silence as to why such method was not an acceptable substitute for the evidence sought, we conclude that he has failed to meet his burden of showing the existence of a substantial basis for claiming prejudice." 862 N.E.2d at 353–54.

This determination does not warrant habeas relief. Under federal law, a remediable *Brady* violation would be established only if there were a "reasonable probabili-ty" that the result of the trial would have been different if Bode's database had been disclosed. *See Strickler,* 527 U.S. at 289–90, 119 S.Ct. 1936. In this case, as the SJC explained, Bly was able to challenge Bode's database before the jury even without receiving the complete set of data he sought. There are also additional reasons why Bly was not prejudiced by the prosecution's failure to produce Bode's database. For one, the trial court heard substantial evidence indicating that Bode's database is, in fact, scientifically reliable. *See* Apr. 2, 1999 Tr. 165 (peer review); *id.* at 170–71 (general acceptance); *id.* at 172–74 (comparison with the Promega database); *id.* at 182 (reliability of the systems used to generate the database); *id.* at 183–84 (accreditation of the laboratory). Moreover, given the extensive testimony supporting Bly's guilt presented at trial, it is not reasonably probable that an enhanced effort to undermine the reliability of Bode's database would have resulted in a not guilty verdict.[3]

In essence, Bly "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. The state court's rulings were, therefore, not contrary to the federal *Brady* doctrine, and did not represent an unreasonable application of this doctrine. Accordingly, this claim is being denied.

### D. *Seizure of DNA Samples (Ground Two)*

Bly's next argument concerns the manner in which the police obtained DNA samples from him. While he was incarcerated, Bly was visited by police detectives, who attempted to persuade him to provide a

---

**3.** In addition, any shortcomings that might have been demonstrated in the database would not have affected Bode's finding that Bly's DNA pattern matches the pattern found on the sweatshirt. Rather, they could only have altered the calculation of the incidence at which this pattern appears. *See* 12 Trial Tr. 49–50.

blood sample voluntarily. Bly declined. In the course of his conversation with the detectives, Bly drank from a water bottle and smoked three cigarettes. After he left the interviewing room, the detectives waited to see if Bly would return to retrieve the bottle and the cigarettes. When he did not, the detectives seized these items, and DNA samples were extracted from them. These DNA samples were used in the DNA testing conducted by the FBI. *See* 11 Trial Tr. 174–76; Trial Ct. Docket. No. 117. Bly argues that the detectives' conduct amounted to an unconstitutional search and seizure, in violation of the Fourth Amendment. This argument was properly exhausted in the state courts as a federal claim.

 However, this court cannot, in these habeas proceedings, reach the question of whether Bly's Fourth Amendment rights were violated. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The rationale for this rule is that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs," namely "deflect[ing] the truth–finding process and often free[ing] the guilty." *Id.* at 490, 493, 96 S.Ct. 3037. The inquiry in the current proceedings is, therefore, limited to whether Bly had a "realistic opportunity to litigate his Fourth Amendment claim fully and fairly in the state system." *Sanna v. Dipaolo,* 265 F.3d 1, 8 (1st Cir.2001).

 "A 'full and fair' hearing is one in which the defendant is given an oppor-

tunity to present evidence and be heard on an issue." *Companonio v. O'Brien,* 672 F.3d 101, 112–13 (1st Cir.2012) (citing *Neron v. Tierney,* 841 F.2d 1197, 1199 (1st Cir.1988)). Bly received such a hearing on his Fourth Amendment claim. The trial court heard evidence on Bly's motion to suppress the evidence in question over three days. At these hearings, Bly cross-examined the prosecution's witnesses and called four witnesses of his own. At Bly's request, the trial court ordered the keeper of the records for the Massachusetts Department of Corrections to produce a collection of documents that Bly believed to be relevant to his motion to suppress. *See* Apr. 16, 1999 Tr. 67. Following these hearings, the trial court issued a ten-page written decision, making findings of fact and rulings of law. *See* Trial Ct. Docket. No. 117. The SJC reexamined Bly's Fourth Amendment claim on appeal, and concluded that no search and seizure had occurred. *See Bly,* 862 N.E.2d at 357. Because these state court proceedings amount to a full and fair hearing on Bly's Fourth Amendment claim, this claim does not support habeas relief. *See Stone,* 428 U.S. at 482, 96 S.Ct. 3037.

E. *Refusal Evidence (Ground Three)*

 In the course of its investigative efforts, the prosecution moved in the trial court for an order compelling Bly to provide blood and hair samples for additional DNA testing, after CBR and the FBI had completed their respective tests. The trial court granted the motion on November 2, 1998. At trial, the court permitted the prosecution to present testimony that although Bly did provide a blood sample, which was used in the tests conducted by Bode, he refused to refrain from cutting his hair to permit an adequate hair sample to be taken from him. *See* 11 Trial Tr. 180; 12 Trial Tr. 18. Bly argues that the

admission of this testimony violated his Fifth Amendment privilege against self-incrimination. This argument, too, was properly presented as a federal claim before the state courts.

The SJC examined Bly's argument on this issue both under federal law and under Article 12 of the Massachusetts Declaration of Rights. *See Bly*, 862 N.E.2d at 361. The latter provision, according to the SJC's case law, is more protective of the privilege against self-incrimination than its federal counterpart. *See id.* (citing *Commonwealth v. Delaney*, 442 Mass. 604, 814 N.E.2d 346 (2004)); *Opinion of the Justices to the Senate*, 412 Mass. 1201, 591 N.E.2d 1073, 1078 (1992). The SJC determined that neither standard was violated in this case.

The standard relevant to the current proceedings is the federal doctrine. The Supreme Court has held that under federal constitutional law, a state may compel a suspect to submit to an examination that is safe, painless, and commonplace. *See Schmerber v. California*, 384 U.S. 757, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Supreme Court has also held that a state may permit a suspect to refuse such a test, but that evidence of his refusal may be presented at trial. *See S. Dakota v. Neville*, 459 U.S. 553, 563, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *Roberts v. Maine*, 48 F.3d 1287, 1295 (1st Cir.1995). The Court has explained that "the values behind the Fifth Amendment are not hindered when the state offers a suspect the choice of submitting to [the test] or having his refusal used against him." *Neville*, 459 U.S. at 563, 103 S.Ct. 916 (discussing a suspect's refusal to submit to a blood-alcohol test).

This doctrine applies in the current case. By keeping his hair closely cropped, Bly refused to submit to a safe, painless, and commonplace examination. Under *Ne-*

*ville*, the state was constitutionally permitted to present evidence of his refusal to submit to the test at trial. The admission of this refusal evidence did not, therefore, violate Bly's federal constitutional privilege against self-incrimination.

Thus, the state courts' decisions on this score were not contrary to, or an unreasonable application of, clearly established federal law, and they do not warrant habeas relief.

F. *Woodsum's Identification: Admissibility (Ground Four, First Component)*

Bly moved in limine to exclude Woodsum's testimony identifying Bly as the man Woodsum had seen by the Highland Street station on the evening of the shooting. His motion identified several weaknesses in the reliability of Woodsum's identification testimony, including: the "cross-racial" nature of the identification, namely the fact that Bly is black and Woodsum is white; the 27–month lapse between the night of the shooting and Woodsum's identification of Bly on television; and the suggestive circumstances under which the identification occurred, namely Bly's presence in court to be indicted for the murder of McLaughlin. The trial court permitted Woodsum to testify. On appeal, the SJC found that "[a]lthough Bly's appeal raises several valid factors for the jury's consideration of the reliability of Woodsum's identification ... we cannot conclude that the judge abused his discretion in allowing Woodsum's testimony." 862 N.E.2d at 359–60.

Bly's submissions on appeal and in the current proceedings assert, among other things, that the admission of Woodsum's identification testimony violated Bly's right to due process. *See* Bly App. Br. at 52, 92; Pet'r's Mem. at 48. This argument may,

therefore, be viewed as a properly exhausted federal claim.

■■■■■ An evidentiary ruling may violate a defendant's constitutional rights if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868; *Brown,* 227 F.3d at 645; *Crouse,* 2013 WL 1054845, at *11. Due process does not require that all evidence admitted against a defendant, including identification evidence, be completely reliable:

> It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and . . . is not a factor that goes to the very heart the "integrity" of the adversary process. "Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts. . . ."

*Manson v. Brathwaite,* 432 U.S. 98, 113 n. 14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (quoting *Clemons v. United States,* 408 F.2d 1230, 1251 (1968)); *Kansas v. Ventris,* 556 U.S. 586, 594 n. *, 129 S.Ct. 1841, 173 L.Ed.2d 801 (2009).

■■■ The admission of Woodsum's testimony at trial was neither contrary to, nor an unreasonable application of, this due process-based federal doctrine. Although Woodsum's identification of Bly suffered from certain weaknesses, these were weaknesses that Bly's counsel was able to bring to the jury's attention through cross-examination and closing argument. *See* 5 Trial Tr. 23–80; 16 Trial Tr. 28. The trial court's decision to permit the jury to make its own assessment of Woodsum's credibility did not "infect[ ] the trial with unfairness." *Donnelly,* 416 U.S. at 643, 94 S.Ct.

1868. It did not "go[ ] to the very heart the 'integrity' of the adversary process." *Manson,* 432 U.S. at 113 n. 14, 97 S.Ct. 2243. The admission of Woodsum's identification testimony was, therefore, not contrary to, or an unreasonable application of, clearly established federal law, and it does not support habeas relief.

G. *Woodsum's Identification: Expert Testimony (Ground Four, Second Component)*

■■■ Bly asserts another, related argument in Ground Four of the Petition. At trial, Bly sought to present expert testimony concerning various factors that affect the reliability of identifications, including the relative weakness of cross-racial identification. Bly's proposed expert was Dr. Alexander Yarmey, a professor of psychology. After a voir dire examination, the trial court declined to permit Dr. Yarmey to testify. *See* 15 Trial Tr. 71–72.

Bly does not specifically assert federal grounds for his challenge to the trial court's exclusion of Dr. Yarmey's testimony. However, Bly's wish to present testimony by Dr. Yarmey was closely tied to his objection to Woodsum's identification testimony. His argument on this issue may, therefore, reasonably be construed as an exhausted federal claim, namely as an extension of Bly's due process challenge to the trial court's treatment of Woodsum's testimony.

Understood as a due process argument, Bly's challenge to the trial court's decision to exclude Dr. Yarmey's testimony establishes a constitutional violation only if it shows that this decision "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868; *Brown,* 227 F.3d at 645; *Crouse,* 2013 WL

1054845, at *11. This standard is not satisfied.

The trial court reasoned that the jury could capably evaluate the reliability of Woodsum's opinion without the aid of expert testimony. *See* 15 Trial Tr. 71–72. The SJC concluded that this ruling was within the trial court's discretion "because there was substantial corroboration of Woodsum's eyewitness identification by witnesses who assisted Bly in preparing for the killing, and who heard his admissions thereafter." *Bly*, 862 N.E.2d at 360 (citing *Commonwealth v. Santoli*, 424 Mass. 837, 680 N.E.2d 1116 (1997)). These determinations were not unfair.

In any event, the exclusion of Dr. Yarmey's testimony did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868. It was not contrary to, or an unreasonable application of, clearly established federal law, and it does not warrant habeas relief.

### H. *Woodsum's Identification: Jury Instruction (Ground Five)*

The next claim asserted in the Petition concerns the trial court's jury instructions. Bly asked the court to provide a specific jury instruction concerning the relative unreliability of cross-racial identification. The trial court declined, and the SJC found that this decision was not an abuse of discretion. *See* 16 Trial Tr. 129; 862 N.E.2d at 360. Bly challenges the correctness of these rulings. This challenge, too, is essentially an offshoot of the trial court's decision to admit Woodsum's identification testimony. Consequently, it, too, may be viewed as a prong of Bly's exhausted federal due process argument.

■■■ Due process concerns are, indeed, the appropriate foundation for a challenge, like Bly's, to a trial court's jury instructions. Because "[i]nstructions in a state trial are a matter of state law to which substantial deference is owed," the general rule is that "improper jury instructions will not form the basis for federal habeas corpus relief." *Niziolek v. Ashe*, 694 F.2d 282, 290 (1st Cir.1982). However, habeas relief is appropriate where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)); *Rosado v. Allen*, 482 F.Supp.2d 94, 114 (D.Mass.2007).

■■■ The trial court's refusal to provide the instruction requested by Bly did not constitute a violation of due process. Bly's proposed instruction would have stated that the jury "may consider . . . that persons of one race have difficulty in identifying persons of another race." *See* Trial Ct. Docket. No. 159. The trial judge declined to use this language, instead providing a more general instruction on identification testimony. Among other things, the court's instruction addressed: the method and conditions of the original observation; the passage of time between the original observation and the eventual identification; the circumstances of the eventual identification; and the possibility of a good faith mistake. *See* 16 Trial Tr. 106–09. The trial court's decision to provide these more general guidelines and to omit Bly's proposed instruction was reasonable. In any event, it did not "so infect[ ] the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147, 94 S.Ct. 396. This decision was not contrary to, or an unreasonable application of, clearly established federal law, and it does not warrant habeas relief.

### I. *Evidence of Prior Bad Acts (Ground Six)*

■■■ The trial court permitted the prosecution to present testimony from sev-

eral witnesses concerning earlier efforts by Bly to intimidate or murder Alston, the victim and key witness in the criminal case that was scheduled to begin against Bly on the day after McLaughlin was killed. Alston himself testified that in the summer of 1994, Bly's acquaintance Errol Moses exacted from Alston a signed document stating that Alston would not press charges against Bly. Alston added that in September of that year, Moses shot Alston, injuring him badly. Hardy, Bly's acquaintance, testified that in August of 1995, Bly called Hardy and requested that he "set up" Moses to be killed by Bly and Gittens, because although Moses had shot Alston, he had failed to kill him. In addition, the grand jury testimony of another witness, Comilus Pope, was admitted, in which Pope testified that Bly had telephoned him to request that he kill Alston. *See* 6 Trial Tr. 100; 7 Trial Tr. 102; 8 Trial Tr. 34–40.

The witnesses' testimony on these matters was admitted over Bly's objection. Bly argues that this testimony was unfairly prejudicial evidence of prior bad acts, and that it should, therefore, have been excluded.

■ Like Bly's attack on the reliability of Bode's DNA testing, discussed earlier, Bly's challenge to the testimony concerning his prior bad acts does not rely on any doctrine of federal law. The same analysis described earlier applies here as well. A challenge, such as Bly's, to a trial court's admission of evidence of prior bad acts may be formulated in federal constitutional terms, as a potential violation of due process. *See Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868; *Coningford v. Rhode Island*, 640 F.3d 478, 485 (1st Cir.2011). However, it would not be helpful to Bly for his argument to be construed as a federal claim, because this claim was not presented and exhausted in state court. *See* Bly

App. Br. at 67–69. This claim would, therefore, be unavailing and, moreover, would subject the entire Petition to dismissal as a mixed petition. *See Rose*, 455 U.S. at 522, 102 S.Ct. 1198; *DeLong*, 715 F.3d at 387. Here, too, a stay of the proceedings for exhaustion purposes would not be appropriate because there is no indication that Bly had good cause for his failure to exhaust this claim, and because it is not likely that a due process argument against the admission of the testimony of Alston, Hardy, and Pope would be meritorious. *See Rhines*, 544 U.S. at 278, 125 S.Ct. 1528; *Clements*, 485 F.3d at 171.

The court is, therefore, not construing Bly's argument concerning the testimony of his prior bad acts as a federal claim. As an argument based on state law alone, this claims cannot support habeas relief.

### J. *Production of Medical Records (Ground Seven)*

Bly moved before trial for an order requiring the prosecution to produce to Bly the medical records of prosecution witness Janet Brown. Bly argued that Brown's history of mental health issues was relevant to her credibility. The trial court denied the motion. *See* Trial Ct. Docket. No. 105.1. Bly argues that this decision impaired his ability to cross-examine Brown effectively.

Bly's challenge to this trial court ruling was arguably exhausted as a federal claim in the state court proceedings. Before the SJC, Bly relied, in part, on the Massachusetts case *Commonwealth v. Bishop*, 416 Mass. 169, 617 N.E.2d 990 (1993). Bly argued to the SJC that *Bishop* addresses "the constitutional requirement that a defendant be able to fully confront the witnesses against him." Bly App. Br. at 69–71. The SJC's analysis in *Bishop* draws on both state and federal constitutional authorities, including *Pennsylvania v. Rit-*

*chie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). These indirect references to federal constitutional law are arguably sufficient to satisfy the exhaustion requirement. *See Clements,* 485 F.3d at 162; *Nadworny v. Fair,* 872 F.2d 1093, 1099–1100 (1st Cir.1989). In any event, because Bly's claim concerning Brown's medical records is not meritorious, and because the court is permitted to deny unexhausted claims on their merits, *see* § 2254(b)(2), a definitive determination as to exhaustion is not necessary.

■■■■ The SJC, rejecting Bly's challenge to the trial court's treatment of his request for Brown's medical records, found that any error by the trial court was harmless. If this determination is correct, it precludes habeas relief. Certain constitutional violations are "so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Such violations include "denying a defendant the assistance of counsel at trial, or compelling him to stand trial before a trier of fact with a financial stake in the outcome." *Id.* However, excessive limitations on "the opportunity to cross-examine an adverse witness do[ ] not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Id.* at 682, 106 S.Ct. 1431; *DiBenedetto v. Hall,* 272 F.3d 1, 10 (1st Cir.2001). Rather, a claim that cross-examination has been hindered unconstitutionally is subject to harmless error review. *See Sanna,* 265 F.3d at 14; *Farley v. Bissonnette,* 544 F.3d 344, 347 (1st Cir.2008). Under this standard of review, the court "must set aside the judgment unless it is satisfied that the error was harmless beyond a reasonable doubt." *Sanna,* 265 F.3d at 14 (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *Mitchell v. Esparza,* 540 U.S. 12, 17–18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003).

■■■■ Because of the trial court's treatment of Brown's medical records during the trial itself, it is clear beyond a reasonable doubt that any pretrial error on this matter was harmless. On the witness stand, Brown appeared to be confused about the chronology of certain events. The trial judge suspended Brown's testimony and ordered that her medical records be subpoenaed for the court's review. A portion of the medical records was made available to the defense on May 19, 1999. The remainder of the records was made available on May 21, 1999, a Friday. Court was adjourned early on that day. Defense counsel's cross-examination of Brown resumed on the following Monday without further objection. The defense's cross-examination brought to light Brown's medications, her history of hospitalization after experiencing hallucinations, and her prior diagnosis of paranoid schizophrenia. *See* 5 Trial Tr. 229; 10 Trial Tr. 193; 12 Trial Tr. 3, 147; 13 Trial Tr. 33–34.

Given these developments, Bly was eventually provided with ample opportunity to review Brown's medical records and to make use of those records in his cross-examination. He took full advantage of this opportunity. Therefore, even assuming that the trial court's pretrial decision was constitutionally erroneous, any such error was harmless, even in the sense that Bly's right to cross-examine Brown was not ultimately constrained. Accordingly, there is no need to determine whether any error was also harmless because of the wealth of other evidence to prove Bly's guilt. Habeas relief on the basis of the trial court's initial denial of Bly's request for discovery is not warranted, therefore.

## K. Miranda Warnings (Ground Eight)

Bly's final claim concerns a police interview conducted with Bly on September 26, 1995, the day after McLaughlin was shot. Police testimony about this interview, as well as a recording of a portion of the interview, were admitted at trial. Bly maintained his innocence at the interview. He did, however, make a remark that was presented by the prosecution as illustrative of Bly's alleged motive: denying that he had murdered McLaughlin, Bly stated, "I beat him twice, why would I kill him?" 7 Trial Tr. 80.

Bly moved in limine to suppress evidence of, and evidence derived from, the September 26, 1995 interview, arguing that the interview had not been preceded by Miranda warnings. The trial court determined that Bly had not been in custody at the time of the interview and that Miranda warnings were, therefore, not required. *See* Trial Ct. Docket. No. 116. The SJC agreed. *See* 862 N.E.2d at 357–59. Bly's Fifth Amendment-based challenge to these rulings was properly exhausted in state court.

■■■■ Under federal law, "[a] person must . . . be 'in custody' before Miranda warnings are due." *Locke v. Cattell,* 476 F.3d 46, 51 (1st Cir.2007). In order to determine if a person was "in custody," "[t]wo discrete inquiries are essential . . .: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). "[T]he ultimate inquiry is simply whether there is a 'formal arrest or re-

straint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)); *Yarborough v. Alvarado,* 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

■■■ The circumstances of the September 26, 1995 interview are not now in dispute.[4] Plainclothes patrolmen recognized Bly in Mattapan. Bly was not yet the focus of the murder investigation, but the investigating detectives were interested in speaking with him. The patrolmen broadcast on their police radios that they had located Bly. Two detectives arrived and asked Bly if he would accompany them to the police station. Bly agreed. At the station, two other detectives interviewed Bly in a detectives' office. The door to the office was left open. After a few minutes of conversation, the detectives asked Bly if they could tape-record the interview, to which he responded, "Do it. I got nothing to be afraid of, nothing to worry about." Bly stated on tape that he had come to the interview willingly and voluntarily. The interview lasted approximately forty-five minutes. The tenor of the discussion was conversational. Bly did not request an attorney or ask to leave. At the end of the interview, Bly listened to the recording and was given an opportunity to make any corrections. The detectives then drove Bly back to Mattapan. *See* Apr. 12, 1999 Tr. 30–125; Trial Ct. Docket. No. 116.

Assuming, without finding, that reasonable jurists could disagree over whether Bly was in custody, for Miranda purposes, during the September 26, 1995 interview, *see Yarborough,* 541 U.S. at 664, 124 S.Ct.

---

4. Bly initially asserted another version of the events in an affidavit, but he has since adopted the facts found by the trial court.

*See* Bly's App. Br. 72–74; Pet'r's Mem. at 56–58.

2140, the state courts' view was not an "unreasonable" application of established federal law. Several factors support the state courts' conclusion that Bly was not in custody, including: the detectives' request for Bly's consent before driving him to the police station, and again before tape-recording the interview; the fact that the interview took place in a detectives' office, with the door open; Bly's recorded acknowledgement that he had come to the interview willingly and voluntarily; the limited duration of the interview; and the interview's conversational tenor. The state courts' conclusion "fits within the matrix" of the Supreme Court's Miranda jurisprudence. *See id.* at 665, 124 S.Ct. 2140. " '[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly.' Relief is available ... only if the state court's decision is objectively unreasonable." *Id.* (alterations in original) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)). In this case, the court does not conclude that the state court decisions that Bly was not in custody were incorrect. In any event, because the state courts' decisions were not "objectively unreasonable," this final claim, like the others asserted in the Petition, does not warrant habeas relief.

## V. CERTIFICATE OF APPEALABILITY

The court is required to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing Section 2254 Proceedings, Rule 11(a). A certificate of appealability ("COA") is warranted if a petitioner has made "a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(3). In other words, a COA should be issued if "reasonable ju-

rists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' " *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller–El v. Cockrell,* 537 U.S. 322, 338, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

The court does not find that reasonable jurists could debate whether the court correctly analyzed the claims addressed on their merits, namely all of the claims initially asserted in the Petition. A COA is, therefore, being denied as to these claims. Bly may seek a COA from the court of appeals. *See* Rules Governing Section 2254 Proceedings, Rule 11(a).

On the other hand, the court is granting a COA with regard to the claims added to the Petition by way of amendment. The court did not reach the merits of these claims because a single justice of the SJC determined that they were not "new and substantial" and because, under *Costa,* this determination renders these claims procedurally defaulted. However, as indicated earlier, there is some tension between *Costa* and prior First Circuit holdings concerning whether an order denying leave to appeal under § 33E necessarily generates procedural default. *See Souza,* 2013 WL 4517978, at *5 n. 3; *Lee,* 2013 WL 6865585, at *11 n. 7. Therefore, the court finds that reasonable jurists could disagree as to whether the claims added to the Petition by amendment are procedurally defaulted. A COA is, there-

fore, appropriate as to these claims. *See Lee*, 2013 WL 6865585, at \*15.

## VI. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Bly's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is DE-NIED.

2. A certificate of appealability is IS-SUED as to the claims added to the Petition by amendment (pages 59–81 of Bly's Memorandum of Law (Docket No. 16)) and DENIED as to all other claims.