# United States Court of Appeals
## For the First Circuit

No. 19-2104

JASON STRICKLAND,

Petitioner, Appellant,

v.

COLETTE GOGUEN, Superintendent, NCCI Gardner,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Ira L. Grant and the Committee for Public Counsel Services,
for the appellant.
Maura Healey, Attorney General of Massachusetts, and Susanne
G. Reardon, Assistant Attorney General, for the appellee.

June 30, 2021

THOMPSON, **Circuit Judge**.  A jury convicted petitioner Jason Strickland of multiple counts of assault and battery on his step-daughter Haleigh Poutre who was eleven years old when the final attack landed her near death in the hospital.[1]  After Massachusetts' state courts denied Strickland's appeals, he migrated to the United States District Court for the District of Massachusetts, seeking a writ of habeas corpus via 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA).  Strickland alleged violations by the trial court of his constitutional rights "to present a complete defense" and to have effective assistance of counsel, and the district court denied his petition.  See Strickland v. Goguen, No. 16-cv-11364-ADB, 2019 WL 4675031, *1 (D. Mass. Sept. 25, 2019).  Before us, Strickland repeats those claims.  After careful consideration and mindful of AEDPA's strict requirements, we affirm.

## Background

In scrutinizing a state conviction on habeas review pursuant to AEDPA, we accept the state court's factual findings. See Dorsica v. Marchilli, 941 F.3d 12, 14 (1st Cir. 2019) (quoting Hensley v. Roden, 755 F.3d 724, 727 (1st Cir. 2014)).  If the Supreme Judicial Court of Massachusetts, the Commonwealth's

---

[1]  Although the record does not reflect this, Haleigh survived the injuries. See Kaitlin Goslee, Haleigh Poutre, 10 Years Later, WWLP 22 News (May 11, 2015, 6:00 PM) https://www.wwlp.com/news/haleigh-poutre-10-years-later.

highest court, has declined to review the conviction, then we can rely upon the "'last reasoned decision' issued by the Massachusetts Appeals Court" (MAC) in crafting the factual and procedural narrative. Id. (quoting King v. MacEachern, 665 F.3d 247, 252 (1st Cir. 2011)). We do so here, supplementing with facts from the record where appropriate. See Companonio v. O'Brien, 672 F.3d 101, 104 (1st Cir. 2012) (citing Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009)). A heads-up to the reader, the details of what unfolded are disturbing.

## The Abuse

The MAC starts its recitation of the story at the end: "When . . . Haleigh Poutre arrived at the hospital on September 11, 2005, she was unconscious and barely breathing, her pale, emaciated body was covered in bruises and huge burns." Commonwealth v. Strickland, 23 N.E.3d 135, 138 (Mass. App. Ct. 2015). Her "face was bloody, bruised, and distorted," and "the back of her head was swollen, lacerated, and bleeding." Id. In trying to save Haleigh's life, doctors described her head as "boggy" because of the amount of blood pooling in her skull. Id. at 139. She could barely breathe, her vital signs hovered around death (her body's core temperature was only eighty-one degrees), and she was both unconscious and unresponsive. See id. Additional signs such as fixed pupils and "postur[ed]" limbs "signal[ed] a traumatic brain injury." Id. Doctors also discovered evidence of

- 3 -

other abuse.  Haleigh bore injuries on her wrists consistent with wearing restraints, cigarette burns covered her left foot and left arm, lacerations scarred her buttocks, and "other injuries of varying age [covered her] from her head to her toes."  Id. at 139 & n.3.

Haleigh's injuries occurred over the course of years, but we will start with the traumatic head injury, which brought her to the hospital and which spurred the police to investigate Strickland.  At the time she sustained the brain injury Haleigh lived with her adoptive mother Holli Strickland (who also happened to be Haleigh's maternal aunt) and her stepfather Strickland.  See id. at 140.

According to eyewitness testimony from Holli's biological daughter (let's call her J),[2] on September 10, 2005, the day before Haleigh's hospitalization, the Stricklands kicked Haleigh down the basement staircase.  See id.  And this was not the first time.  See id. Alicia Weiss -- the Stricklands' neighbor and sometimes babysitter, and Holli's close friend -- testified to observing Holli kick Haleigh down the basement stairs repeatedly in 2005, forcing Haleigh to unfurl herself from the floor at the bottom and return to the top where she suffered the routine over and over.  Although, according to Weiss, Strickland was not present

_____

[2]  Because J was only twelve when she testified at trial, we refrain from using her full name.

- 4 -

for this earlier staircase abuse, J testified that sometime in the afternoon or early evening of September 10 (one of the Commonwealth's experts at trial estimated that the injury occurred around 4 P.M.) Strickland participated in the stair-kicking torment. Id. at 139-40. While Haleigh was sprawled on the basement floor, J remembered Strickland then shaking Haleigh at the bottom of the stairs to rouse her before next carrying her limp body upstairs, initially putting her into an empty bathtub on the first floor and then placing her into bed.[3] See id. at 140.[4]

Instead of getting medical help for Haleigh that evening, Strickland went to the mall with J and J's younger brother around 7 or 8 P.M.[5] See id. at 140-41. The following afternoon (September 11) the family went to J's soccer game where they met up with Haleigh's uncle. Id. at 141. While the rest of the family was out, Weiss babysat Haleigh, who remained in bed. Id. Weiss

---

[3] J could not remember precisely when she saw the abuse. She testified that she had played a soccer game before it happened and that Strickland carried Haleigh upstairs before her bedtime.

[4] Indeed, when the police searched the Stricklands' home following Haleigh's hospitalization, they found "holes, indentations, and small brown blood stains on the walls of the stairway leading to the basement. Blood stains were also located on three walls of the basement playroom area, as well as in the first-floor bathroom." Strickland, 23 N.E.3d at 140. Forensic tests of the blood "match[ed] Haleigh's blood." Id.

[5] Holli was the biological mother of both J and her younger brother. Strickland was the biological father only of J's younger brother, who was two years old in 2005.

checked on Haleigh three times, seeing "some foam on Haleigh's mouth," but "Haleigh neither moved nor woke up." Id. When the family returned, it was Haleigh's uncle who brought the child down from her room and insisted Holli take Haleigh to the hospital where the doctors assessed her traumatic brain injuries; by then it was around 2:30 P.M. Id. At trial, whereas the defense put on evidence that Haleigh hurt herself by landing on her head after a failed backflip attempt and that her brain could not have suffered such trauma from falling down the stairs, see id. at 141-42, the Commonwealth's experts confirmed that stairs could create such harm to a person pushed with "significant external force[], such as a [strong] push or kick of the child at the top," id. at 139.

Of course, a fall could not have caused the extensive injuries Haleigh endured, as described by the Commonwealth's expert over the course of "almost one hundred pages of [trial] transcript." Id. at 139 n.3. As for the other injuries, J testified that "she had seen Holli and Strickland hit Haleigh with their hands, a belt, and a baseball bat, and that she saw scabs and bruises all over Haleigh." Id. at 140. During their search of the Stricklands' home, police recovered a "Leatherman tool"[6] and a baseball bat from the home; the Leatherman had "brownish

---

[6] A "Leatherman tool," according to Strickland's testimony, is something that has different attachments in the handle, like knives, a screwdriver tool, and a corkscrew.

material on it . . . indicat[ing] a mixture of blood" for "which Haleigh was a potential contributor."  The "aluminum bat" had "Haleigh's name on it."  Id.  Weiss told the jury that Holli beat Haleigh's lower legs with the bat while Strickland aided Holli in interrogating the child about such crimes as hiding candy wrappers. Id. at 141.  Weiss and one of J's friends also testified to seeing Strickland: strike Haleigh on the hand with a "plastic tubular wand;" drag Haleigh into the house by the ear and slam her into a chair; take Haleigh into a bathroom with Holli "after which a muffled cry was heard and Haleigh emerged with a bloody lip;" and striking Haleigh "in the head with his hand."  Id. at 141.

In July 2006, a Commonwealth grand jury indicted Strickland on multiple counts of assault and battery against a child causing substantial injury.[7]  The first two counts charged Strickland under Massachusetts General Laws ch. 265, § 13J(b) for the September 10, 2005 stair incident (count 1) and for an unspecified injury or injuries prior to September 11 (count 2). The crime contains two theories of guilt.  A conviction can be obtained for a defendant's actual assault and battery causing substantial bodily injury to a child, or, under the second theory,

---

[7]  Holli was also arrested for child abuse.  After being released on bail and before she or Strickland was indicted, Holli was found dead along with her adoptive mother on September 22, 2005.  It was apparently a murder-suicide.  See Strickland, 2019 WL 4675031, *1 n.1.

a conviction can be obtained for a defendant "wantonly or recklessly permitting, or wantonly or recklessly permitting another to commit [such] an assault and battery." Mass. Gen. Laws ch. 265, § 13J(b). Additionally, Strickland faced three counts of assault and battery by means of a dangerous weapon: bat (count 3); shod foot (count 4); and tubular wand or stick (count 5). See id. at § 15A(b). Finally, the indictment charged Strickland with general assault and battery for striking Haleigh with his hand (count 6). See id. at § 13A.

## The Trial

At trial, the defense argued Strickland was oblivious to what he had come to understand was the reality of Holli's abusive behavior. Before September 10, 2005, his wife told him (and he said he believed) that Haleigh was abusing herself. See id. at 141-42. In support of his claim of innocence, Strickland called to the stand Pamela Krzyzek, a health professional who visited the family's home to check on Haleigh on behalf of Massachusetts' Department of Social Services.[8] She "testified that Haleigh told

---

[8] Holli convinced the agency, now known as the Department of Children and Families, see Strickland 23 N.E.3d at 145 n.13, to remove Haleigh from the home of her biological mother (Holli's sister) when Haleigh was four years old because, as Holli and Haleigh told the agency, Haleigh's mother and boyfriend were sexually abusing the child. Shortly following Haleigh's hospitalization, Holli's ex-husband told the agency that Holli had both invented the sexual abuse and coached Haleigh on what to say to the agency. Apparently, Holli and her ex-husband had gone through a miscarriage and Holli wanted Haleigh as her own daughter.

[Krzyzek] she heard voices telling her to hurt herself and that [Haleigh] had hit her [own] knees with a hammer." Id. at 141. Another witness aiding Strickland's story of ignorance was a mother, Stephanie Trent Adams, whose children attended daycare at the Stricklands' home (Holli ran a daycare for some time). She testified on several key points: Strickland worked during the day; she had witnessed Haleigh "punching herself, and hitting her[self] against the wall of a cubby;" she saw Haleigh "stair-surfing," which, as best as the record shows, is a game in which children slide down stairs on their behinds step-by-step. Id. Strickland eventually took the stand reiterating his defense theory. He denied any wrongdoing, and stressed he had "believed Holli when she told him that Haleigh was injuring herself and was receiving treatment for this condition" and he put forward that "[o]nly Holli would take Haleigh to these [doctors'] appointments and would speak with the medical providers." Id. at 141-142. He also stated he enjoyed Haleigh's company, hugged her often, and treated her like a biological daughter.

Strickland, in addition, wanted Haleigh's medical providers to testify to their belief that Haleigh was self-abusive.[9] Id. at 142. Alongside their testimony, Strickland

_____

[9] Specifically, the medical providers were Haleigh's pediatrician (Dr. Rukmini Kenia), nurse practitioner (Susan Malloy), therapist or social worker (Carol Fields), and psychiatrist (Dr. Frank Gatti). Because the differentiation does

sought to introduce medical records reflecting that the medical providers regularly saw Haleigh from at least 2001 until September 2, 2005 -- indeed, almost weekly in 2004 and 2005 -- and that they treated Haleigh for self-abuse after "observ[ing] bruises and burns." Id. The witnesses and medical records would, defense counsel argued, "corroborate [Strickland's] belief" that he "had no reason to protect [Haleigh] because he thought it was self-abuse, so did the doctors, so did everybody else." Id. Defense counsel contended the providers' states of mind -- what they believed about Haleigh's medical condition -- would help Strickland overcome the jury's likely skepticism that he did nothing wrong. See id. at 142-43.

In the MAC's factual summation, it described Strickland's evidentiary trial proffer as the "novel use of medical testimony and reports to buttress" his contention that "he reasonably believed Holli when she told him that Haleigh's injuries resulted from self-abuse, and that he reasonably concluded that Haleigh was being appropriately treated by medical professionals, and that he therefore did not need to take additional actions to protect her." Id. at 143. The trial judge, the MAC noted, was unpersuaded. He excluded the evidence because, in part, he deemed

---

not matter for our analysis and because Strickland's brief does not distinguish them, we refer to them collectively as "medical providers."

the evidence irrelevant to Strickland's defense since the excluded testimony and medical records could only illustrate the medical providers' beliefs, not Strickland's.[10]

The jury convicted Strickland of five of the six counts brought by the Commonwealth. For counts 1 (the stair-kicking) and 2 (assaults causing substantial injury before September 11), the jury found Strickland guilty of "wantonly or recklessly permitting, or wantonly or recklessly permitting another to commit [such] an assault and battery." Mass. Gen. Laws ch. 265, § 13J(b). For the first two counts, the jury did not convict Strickland of actually abusing Haleigh, but they did convict him for his actual abuse of Haleigh on counts 3 (bat), 5 (tubular wand), and 6 (hand).[11] Strickland, 23 N.E.3d at 138.

### Strickland's Appeals and Petitions

The MAC explained that while Strickland's trial was in process Haleigh's legal guardian filed a civil suit against Haleigh's medical providers, including Krzyzek. Krzyzek hired two

---

[10] The trial judge also concluded Strickland offered the evidence for the impermissible purpose of corroborating Holli's and Haleigh's inadmissible hearsay statements to the medical providers. See Strickland, 23 N.E.3d at 143. The judge had permitted a limited range of hearsay statements from Holli and Haleigh concerning the source of Haleigh's injuries to come through Strickland's testimony, but that was the limit of his allowance.

[11] The jury acquitted Strickland of count 4, which, as a reminder, was assault and battery by means of a dangerous weapon (shod foot).

- 11 -

experts, Dr. Robert Chabon and social worker Beth Wechsler who each filed a report concluding that "Holli presented a case of [Munchausen Syndrome by Proxy (MSBP)] and that in the circumstances neither Krzyzek nor her employer reasonably could have been expected to determine that Haleigh was the victim of child abuse." Id. at 150. Mothers presenting MSBP harm "someone else, often a child," to gain attention as a loving caretaker. Id. at 149. They manipulate and lie to convince those with some responsibility for caring for the child (such as medical providers or government agencies) that there is a medical reason for the child's injuries other than abuse. See id. The mother can get away with the abuse in part because with MSBP, as Dr. Chabon explained, the "family constellation typically includes . . . completely oblivious" fathers who are "away at work a great deal." Id.

Partially in light of this evidence presented in the civil lawsuit, Strickland filed both a direct appeal of his conviction and a motion for a new trial. Among other claims not relevant to this habeas petition, the appeal contended that: (1) the trial judge "improperly excluded medical evidence from Haleigh's [medical providers] with respect" to count two (wantonly or recklessly permitting multiple injuries to Haleigh on or before September 11, 2005); and (2) trial "counsel was ineffective . . . for failing to obtain an expert witness on a psychiatric condition known as [MSBP]." Id. at 138-39. To support

the motion for a new trial on the second claim, Strickland attached the expert reports of Dr. Chabon and social worker Wechsler. See id. at 149. The motion judge, who was not the trial judge, denied Strickland's plea. See id. at 141.

It is from this denial that Strickland sought relief from the MAC. See id. at 138. We will delve into the MAC's reasoning more thoroughly as we discuss each issue below. For now, it is enough to know that the court affirmed Strickland's convictions because any constitutional error regarding the exclusion of the medical providers' evidence was harmless, see id. at 144, and upheld the order denying Strickland's motion for a new trial because trial counsel was not ineffective, see id. at 150. The Supreme Judicial Court of Massachusetts declined to hear Strickland's appeal. See Strickland, 2019 WL 4675031, at *6.

With his state remedies blocked, Strickland filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 with the federal district court in Massachusetts, raising the "same arguments that were considered by the [Massachusetts] superior and appellate courts." Id. Following the MAC's reasoning, and quoting the opinion at length, the district court denied Strickland's petition. See id. at *7-8. He appealed to us, and now it is our turn to assess those same claims.

**Discussion**

To set the stage, we briefly summarize Strickland's claims before us. First, he thinks the MAC unreasonably applied federal law when finding any error related to the exclusion of the medical providers' evidence and testimony to be harmless. Second, he thinks the MAC unreasonably applied federal law when rejecting his ineffective assistance of counsel assertion. Neither claim can succeed, as we explain.

## I. Standard of Review

The federal habeas statute AEDPA (which we previewed earlier) governs under what conditions state prisoners like Strickland can file habeas petitions in federal courts, and mandates how federal courts review those petitions. 28 U.S.C. § 2254. The complex statutory scheme demands a lengthy description of the way it instructs us to examine Strickland's petition, but we can summarize one of AEDPA's most pertinent characteristics succinctly, one which cramps the petitioner's hope of relief. Congress demanded we give great deference to state court decisions such that we are "bound by AEDPA's tight (to say the least) parameters" to grant habeas relief only in rare circumstances. Dorsica, 941 F.3d at 14; see Davis v. Ayala, 576 U.S. 257, 268 (2015); Fry v. Pliler, 551 U.S. 112 (2007) (recognizing "that AEDPA limited rather than expanded the availability of habeas relief"). To that end, "[f]actual determinations by state courts are presumed

- 14 -

correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable" given "the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322 (2003) (citations omitted) (citing 28 U.S.C. §§ 2254(d)(2), (e)(1)).

Let's start off with the relatively easy part. We examine the district court's decision denying habeas relief with no deference, but rather we review petitioner's claims, as lawyers say, de novo. See Scott v. Gelb, 810 F.3d 94, 98-99 (1st Cir. 2016) (quoting Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009)). We do this not out of disrespect, but because "we are effectively in the same position as the district court" to look at "the state court record" when, as here, the district court did not conduct any factfinding. Rivera v. Thompson, 879 F.3d 7 (1st Cir. 2018) (quoting Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007)).

It is at this stage when a petitioner starts to face a "steep climb." Cooper v. Bergeron, 778 F.3d 294, 299 (1st Cir. 2015). The statute "mandates [the] highly deferential federal court review of state court holdings" we mentioned earlier when, as here, the state court adjudicated the merits of the petitioner's

habeas claim. Gelb, 810 F.3d at 99 (quoting Zuluaga, 585 F.3d at 27).[12]

Our deference to the state court runs out, such that we can grant habeas relief, only if the petitioner can demonstrate the state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[13] 28 U.S.C. § 2254(d)(1). We key in on "unreasonable application" because that is where Strickland appears to rest his claims. Gelb, 810 F.3d at 101 (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). When analyzing an "unreasonable application" AEDPA claim, we can grant habeas corpus if the state court identified the correct governing principle -- one which comes from Supreme Court decisions -- but unreasonably applied that principle to the petitioner's case. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also Woodfox v. Cain, 772 F.3d 358, 367-68 (5th

---

[12] Neither party contends the MAC did not resolve the merits of Strickland's claim. For completeness, though, what we mean by the merits is a decision "finally resolving the part[y's] claims," one which addresses the "substance of the claim[s]" and which does not resolve the disputes based "on a procedural, or other, ground." Gelb, 810 F.3d at 99 (quoting Yeboah-Sefah, 556 F.3d at 66).

[13] For the record, the Supreme Court has clarified that the "contrary to" inquiry is different from the "unreasonable application" inquiry, but we need not get into the distinction because Strickland seems to argue only that the MAC unreasonably applied governing federal law. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

- 16 -

Cir. 2014) (when reviewing a state court's decision under the "unreasonable application" prong, courts focus on "the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the [claim]").

Even where a state court has misapplied federal law, we will only grant relief to the petitioner "in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents." Dorsica, 941 F.3d at 17 (quoting Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018)); see also Gelb, 810 F.3d at 101 (petitioner must demonstrate "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement" (quoting Richter, 562 U.S. at 103)); Bergeron, 778 F.3d at 299 (only an "objectively unreasonable" legal error will warrant relief (citing White v. Woodall, 572 U.S. 415, 419 (2014))). Moreover, we give more leeway to more generalized rules, like applying the ineffective assistance of counsel standard. See Dorsica, 941 F.3d at 17 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); Richter, 562 U.S. at 105. If the petitioner has managed to demonstrate such an error, it is still not enough to win because he must also illustrate "actual prejudice" resulted from the mistake. Ayala, 576 U.S. at 267

- 17 -

(quoting Brecht v. Abrahamson, 507 U.S. 619, 634 (1993)); Fry, 551 U.S. at 120 (incorporating the Brecht prejudicial standard into AEDPA review).

Because explaining AEDPA's setup was more than a mouthful, we pause to make pellucid how the standard of review applies to Strickland's appeals. For his excluded medical providers' evidence claim, recall the MAC concluded that any possible error was harmless. Strickland, 23 N.E.3d at 144. Therefore, we must assess whether the MAC applied the federal harmlessness test unreasonably. See Ayala, 576 U.S. at 269; Dorsica, 941 F.3d at 19-20. We are not asking whether Strickland's substantive evidentiary claims are correct. Similarly, for Strickland's second claim about ineffective assistance of counsel, we are assessing whether the MAC unreasonably applied the federal ineffective assistance of counsel test when determining Strickland's claim had not passed muster.[14] Strickland, 23 N.E.3d

---

[14] Neither party contends the MAC did not apply federal law, even though it assessed Strickland's claims using Massachusetts law. See Strickland, 23 N.E.3d at 143-44, 149-150. A state court decision applying state law deserves deference under AEDPA "as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the defendant's rights." Gelb, 810 F.3d at 99. Massachusetts applies a test to determine whether a constitutional error was harmless that is at least as protective as its federal equivalent. See Dorsica, 941 F.3d 12, 19 (noting the Massachusetts harmlessness test in Commonwealth v. Marini, 378 N.E.2d 51, 58 (Mass. 1978) quotes from the federal standard outlined in Chapman v. California, 386 U.S. 18, 24 (1967)); see also Petrillo v. O'Neil, 428 F.3d 41, 45 (1st Cir. 2005). The same is true of Strickland's ineffective

at 150. We are <u>not</u> examining the merits of Strickland's ineffective assistance of counsel argument. For what it's worth, the government thinks the MAC's conclusion was reasonable to say the least.

## II. Constitutional Right to Present a Defense and Harmless Error

Because we are evaluating whether the MAC unreasonably applied clearly established federal law, we turn first to the MAC's decision and the substantive law before getting to the merits of Strickland's allegations.

### A. The MAC's Reasoning and Harmlessness Law

The MAC assumed the excluded medical providers' evidence regarding Haleigh's self-abuse (both testimony by the providers and medical records to that effect) would have "buttress[ed] the defendant's credibility on the wanton or reckless mens rea element of" counts 1 and 2. <u>Strickland</u>, 23 N.E.3d at 143-44. Yet, the MAC avoided "decid[ing] whether the judge's ruling" violated Strickland's constitutional right to present a defense by

___

assistance of counsel claim, where the MAC relied upon <u>Commonwealth</u> v. <u>Saferian</u>, 315 N.E.2d. 878, 882-83 (Mass. 1974). <u>See</u> <u>Lynch</u> v. <u>Ficco</u>, 438 F.3d 35, 48 (1st Cir. 2006) (noting <u>Saferian</u> is at least as protective as the federal standard outlined in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984)); <u>Commonwealth</u> v. <u>Epps</u>, 53 N.E. 3d 1247, 1258-59 (Mass. 2016) (describing the <u>Saferian</u> standard). Because the MAC therefore applied a "functional equivalent" of federal law in applying the state standard for each of Strickland's arguments (and because neither party argued otherwise), we will review the MAC's decisions grounded in state law in the deferential manner demanded by AEDPA. <u>Jewett</u> v. <u>Brady</u>, 634 F.3d 67, 75 (1st Cir. 2011).

- 19 -

concluding any such exclusion was harmless. Id. (quoting Commonwealth v. Smith, 951 N.E.2d 674, 685-86 (Mass. 2011)). To the MAC, there was substantial other evidence of Strickland's guilt and the medical providers' testimony and records were cumulative of other evidence Strickland put forward concerning his defense. Id.

Our review of that decision takes off from a different starting line than where the parties place it. While Strickland and the Commonwealth lay out the contours of a federal constitutional right to present a defense, see, e.g., Crane v. Kentucky, 476 U.S. 683, 690 (1986), remember that we are actually concerned with whether the MAC unreasonably applied the harmlessness test for constitutional errors, see Dorsica, 941 F.3d at 19-20.

The Supreme Court articulated the harmlessness test in Chapman v. California, 386 U.S. 18 (1967): "some constitutional errors" are simply too "unimportant and insignificant" in the circumstances of the case to require reversal. Id. at 22; see also Ayala, 576 U.S. at 268; Glebe v. Frost, 574 U.S. 21, 23 (2014) (per curiam) ("Most constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness."). With respect to constitutional errors impeding a defendant's qualified right to present a defense of his choosing, we will not set aside the conviction if the error was "harmless[] beyond a reasonable

- 20 -

doubt."  United States v. Catalan-Roman, 585 F.3d 453, 466 (1st Cir. 2009), as amended (Dec. 23, 2009).

## B. A Reasonable Application

We arrive finally at the heart of the matter on his first claim.  On appeal, Strickland contends the MAC's harmlessness analysis was unreasonable as a matter of federal law because the excluded testimony and records were not only "central[] to the [i]ssues . . . of the case," but were the "crux" of his defense -- namely what he knew or reasonably could have known about Haleigh's injuries (for counts 1 and 2), and whether "he ever abused Haleigh" (for counts 3, 5, and 6).  Because the evidence's exclusion prevented the jury from having "the complete picture" of his defense, Strickland also alleges the MAC improperly decided any error was harmless because Strickland's hoped-for evidence was cumulative.

According to Strickland, the evidence was central to his case because the jury had a hard time believing his defense without it.  He keys in on the jury's conviction only for "wantonly or recklessly permitting the abuse" on counts 1 and 2, arguing that the jury's failure to convict him for actually abusing Haleigh for those two counts of assault and battery causing substantial bodily injury on a child demonstrates that the jury did not credit all of the eyewitness testimony (recall, J testified that Strickland kicked Haleigh down the stairs).  As Strickland postulates, the

eyewitness testimony "was not so compelling that it rendered harmless the exclusion of the medical evidence . . . Strickland sought to introduce."

The MAC swatted away Strickland's contention that "evidence about Holli's deception would have been" central to the case. In the MAC's view, it was possible that the excluded medical providers' evidence could have corroborated Strickland's testimony and defense theory that he, like the doctors, was convinced Haleigh abused herself and was receiving appropriate care. Strickland, 23 N.E.3d at 143-44. But the MAC found the corroborative value of the excluded medical providers' evidence to be, at best, minimal, and its exclusion to thus be harmless. Id. at 144-45.[15]

For one, the excluded evidence would have only addressed how Holli deceived the medical providers, not whether (or how) Holli could have hidden from Strickland the truth of Haleigh's abuse. See id. at 144. Strickland admitted to having no interaction with the medical providers and never "sp[oke] to a doctor when his child was continually suffering such horrible injuries," so the medical providers' beliefs would not have directly impacted what he thought or knew was happening. Id. at 145. Further, Holli's success at convincing the medical providers

_____

[15] Strickland conceded that the medical providers' evidence could not be considered for its truth (whether the medical providers actually believed Haleigh was self-abusive), which further marginalizes the evidence's centrality.

that Haleigh abused herself, as the evidence presumably would have shown, would not automatically have led a jury to infer that Holli "conceal[ed] her abuse in the home" from Strickland.  Id. at 144. Strickland, after all, lived in the house and had "direct and contemporaneous" observations that the MAC determined were "not susceptible to [the] distortion or obscuration" Holli could manage with the medical providers with whom Strickland did not correspond. Id.  Strickland's vantagepoint for and subsequent inaction following Haleigh's abuse, according to the MAC, "virtually extinguished" any corroborative value of the evidence for which Strickland sought to introduce it.  Id. at 145.

In addition to finding a lack of corroborative value to Strickland's evidentiary proffer, the MAC described the "testimony [as] largely cumulative of other proof," such as Krzyzek's testimony, "that informed the jury of incidents of self-abuse reported by Haleigh and treatment and monitoring of Haleigh for these injuries."  Id.  Strickland contends that he could not "elicit the crucial point that Holli told Haleigh's [medical] providers that Haleigh's injuries were self-inflicted and that they accepted these representations as reasonable."  However, the MAC pointed out that the jury heard plenty of evidence corroborating Strickland's defense.  Krzyzek testified to observing injuries on Haleigh and to hearing both Holli and Haleigh explain the injuries as self-abuse, such as hitting her own knees

- 23 -

with a hammer (in part because she heard voices telling her to hurt herself). Krzyzek also told the jury that Haleigh picked at her scabs and stair surfed, among other acts; behaviors she noticed during her "regular body checks." Id. Further, defense counsel elicited testimony on cross from one of the Commonwealth's experts that Haleigh's nurse practitioner had characterized some of Haleigh's injuries as "self-injury" after observing Haleigh "usually on a weekly basis."[16] Id.

When push came to shove, the MAC rested most of its conclusion on the strength of the prosecution's evidence. Id. Even if the excluded medical providers' evidence would have bolstered Strickland's credibility with the jury about what he reasonably knew or could have known about Haleigh's abuse, the evidence would not have been central to the jury's conclusion. See id. at 144-45. As the MAC detailed, "multiple eyewitness

---

[16] Although the MAC did not rely on all of the possible evidence to support its point that the excluded medical providers' evidence was cumulative, we note that the record provides plenty of additional bases to take the MAC's conclusion as reasonable. For example, Strickland testified that a medical provider "was performing body checks on Haleigh weekly because Haleigh was hurting herself" and that this provider "saw [Haleigh] every week to see if there were new injuries, [and] to make sure the old injuries were healing." Strickland then denied abusing Haleigh and expressed his belief that Holli was having Haleigh treated for self-abuse at her almost-weekly doctors' visits. Strickland told the jury that he saw Haleigh stick a spoon down her throat at a hospital. And, in closing, defense counsel noted how Strickland had observed Haleigh "bang her head," "div[e] down the stairs" and how Strickland would ask her and Holli about injuries "he did not know" existed.

- 24 -

accounts of [Strickland's] own brutality, and his knowledge and acceptance of Holli's brutality" show Strickland was "not merely a duped bystander," no matter what the medical providers' evidence would have demonstrated. Id. Haleigh's sister J observed Strickland being at least present when Haleigh was pushed down the basement stairs on September 10 and Weiss testified Strickland was "present when . . . Holli hit Haleigh in the lower leg with an aluminum bat with Haleigh's name on it." Id. Weiss also remembered Holli explaining, with Strickland in the room, how she "was using Haleigh's bat because it would look like Haleigh was hitting herself" and how she repeatedly hit the same area so new bruises would not show up. Id. Moreover, Weiss "recounted [Strickland] striking the back of Haleigh's hands with a 'tubular wand' made out of plastic," while other witnesses recalled Strickland committing other acts of violence against Haleigh, including dragging her by the ear and subsequently punishing her for trying to buy ice cream. Id. The MAC's point was that the excluded evidence would not likely have altered the jury's conclusion that Strickland directly took part in some of the abuse (counts 3 (bat), 5 (tubular wand), and 6 (general abuse)) while recklessly or wantonly permitting other forms of it (count 2 (the abuse before the September 10 head injury)).[17]

_____

[17] The MAC stated that Strickland did not raise this challenge in state court concerning count 1, which focused on the assault

- 25 -

Recall, we look to see if the MAC's application of the test was unreasonable and we owe the MAC deference. See Richter, 562 U.S. at 101; Dorsica, 941 F.3d at 20 (citing Woodall, 572 U.S. at 419)  The MAC found all of the other evidence would have made any presumed constitutional error harmless beyond a reasonable doubt because the excluded evidence would not have changed the guilty verdict. Strickland, 23 N.E.3d at 144.  Given the abundance of other evidence against Strickland and the admission of evidence regarding Haleigh's self-abuse, a fairminded jurist could reasonably agree that the disallowed medical evidence was "marginally relevant" to Strickland's case, and thus, its exclusion, even if error, was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1983); see also Ayala, 576 U.S. at 268 (describing the harmlessness test on direct appeal,

_____

and battery resulting in Haleigh's traumatic head injury, because the medical providers "never treated Haleigh for the head injury" (so they would have nothing to offer regarding it) "and the defense did not pursue a theory at trial that the head injury was the product of self-abuse." Strickland, 23 N.E.3d at 142.  However, Strickland's opening brief with us challenges the exclusion of the evidence as to all counts, and his petition for a writ of habeas corpus in the district court also did not distinguish between the counts.  Even assuming we would not give deference to the MAC regarding this portion of Strickland's petition, thus reviewing de novo, cf. Wiggins v. Smith, 539 U.S. 510, 534, (2003) (no deference when state court does not reach prong of analysis), Strickland's petition on count 1 fails for the same reasons as the MAC determined for the other counts: Strickland cannot show the trial court's presumed error caused him any prejudice, especially because he did not present a defense of self-abuse as to count 1 at trial.  See Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

as occurred at the MAC (citing Chapman, 386 U.S. at 24)).  We accordingly cannot say the MAC unreasonably applied the harmlessness test in this manner.[18]  See Dorsica, 941 F.3d at 19-20.

### III. Ineffective Assistance of Counsel

Strickland next alleges his trial counsel was constitutionally deficient for not consulting or calling a child

---

[18] Strickland's brief focused heavily on comparing his case to United States v. Shay, 57 F.3d 126 (1st Cir. 1995), so we pause to point out why the comparison is inapt.  In Shay, a defendant had made a number of inculpatory statements regarding a car bomb that killed a police officer and he hoped psychiatrists would testify to his Munchausen Syndrome (the disease drove him to seek attention through exaggerated and grandiose statements).  Id. at 129, 133.  Whereas the trial court concluded the jury could weigh the reliability of the defendant's statements on its own without any specialized testimony and therefore prohibited the specialists' testimony pursuant to Federal Rule of Evidence 702, we determined the jury "plainly was unqualified" to make such an assessment without information from experts about the defendant's possible mental disorders that could have "explode[d] common myths about evidence vital to the government's case."  Id.  We remanded for the trial court to determine if the evidence was excludible on other grounds.  Id. at 134.  Although recognizing Shay dealt with a rule of evidence and not a constitutional right to present a defense (let alone an AEDPA appeal), Strickland implores us to examine his case through the "lens" of Shay because he thinks the MSBP evidence was similarly "vital" to his case, in part because the government "repeatedly push[ed] for the witnesses' exclusion" before arguing in closing "that Strickland's defense . . . was pure fiction."  But Shay does nothing for our AEDPA review because, for the reasons stated above, we conclude the MAC reasonably determined the exclusion of the MSBP evidence was constitutionally harmless.  Cf. United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011) (distinguishing Shay, despite similar exclusion of expert evidence, because of the differing rules of evidence at issue, and because the proffered expert evidence was at best "peripheral" to the question of guilt).

abuse expert who could testify to the effects of MSBP upon fathers like Strickland.  As previewed earlier, due to AEDPA that means we must assess whether the MAC unreasonably applied the clearly established federal standard for examining ineffective assistance of counsel outlined by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  See Wiggins, 539 U.S. at 527-28; Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (describing how there is no doubt Strickland is settled law for the purposes of habeas review).  To tell you why the MAC did not do so, we first explain some background about the claim, then detail the MAC's decision, outline the Strickland standard, and finally apply the AEDPA standard of review.

### A. Expert Testimony on MSBP

In the civil lawsuit brought by Haleigh's legal guardian against the medical providers, experts Dr. Chabon and social worker Wechsler testified that Holli presented a textbook case of MSBP, which enabled her to convince the medical providers Haleigh was self-abusive.  As outlined by Dr. Chabon, MSBP usually involves a mother "who systematically fabricates information about the children's health and/or intentionally makes the child gravely ill."  Not only that, but "[t]he family constellation typically includes fathers who are 'away at work' a great deal and are completely oblivious and are uninvolved in the process that involves numerous office visits and hospitalizations of their own

- 28 -

children."  Social worker Wechsler also clarified that a mother with MSBP can trick "both lay persons and professionals."

Relying upon language within these reports, Strickland (in a familiar manner) asserted in the MAC that this expert evidence could have enhanced the credibility of his testimony by explaining "how Strickland could be truly ignorant of the unbelievably horrible acts."[19]  Strickland took the expert reports as license to allege that his trial counsel was ineffective for failing to obtain an expert on MSBP and child abuse.

## B. The MAC's Decision

The MAC disagreed, largely "[b]ecause the proffered evidence was prepared in relation to defending" medical providers and the evidence "failed to address" Strickland's claims that Holli similarly deceived him.  Strickland, 23 N.E.3d at 150.  The experts in the civil suit, the court went on, did not consider "his role in the abuse."  Id.  As discussed for the excluded medical providers' evidence, the experts, at least based on the reports filed, would not have been able to speak to whether Strickland partook in the abuse because there was no expert "evidence that Holli's deception extended beyond her public presentation to the

---

[19]  In a sidebar at trial regarding the excluded medical providers' evidence, Strickland's counsel raised a similar point, albeit without discussing MSBP: "On first blush, it would be easy for everybody just to say how could [Strickland] be in this home; how could he not . . . protect her."

[medical providers]" and into the home.  Id.  The MAC thereafter concluded Strickland's trial "counsel's behavior [did not fall] below that of an ordinary fallible lawyer and [did not] likely deprive [Strickland] of an otherwise available, substantial ground of defense" by not calling a child abuse expert or putting on MSBP evidence.[20]  Id.

## C. The Strickland Standard with AEDPA Review

Whether the MAC applied Strickland unreasonably is a question "different from asking whether defense counsel's performance fell below Strickland's standard."  Richter, 562 U.S. at 101.  But, as a foundation for our discussion, we lay out the substantive standard.  To prove ineffective assistance of counsel pursuant to Strickland, the petitioner has to get through two hurdles.  First, Strickland must show counsel performed "deficient[ly]" such that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" (more on this in a bit).  Strickland, 466 U.S. at 687; Companonio, 672 F.3d at 110.  Second, Strickland has to demonstrate "that the deficient performance prejudiced the defense" because the "counsel's errors were so

_____

[20]  As a reminder, the Massachusetts test for ineffective assistance of counsel is at least as protective as the federal standard of Strickland, such that we can say the MAC applied clearly established federal law for the purposes of AEDPA review. See note 14, supra.

serious as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 687; Companonio, 672 F.3d at 110.

This is where the AEDPA standard of review once again makes it even harder for Strickland to prevail. The Supreme Court has defined Strickland standing alone as not an "easy task" for defendants to cross-off. Richter, 562 U.S. at 105. Therefore, "[e]stablishing that a state court[] appli[ed] Strickland . . . unreasonabl[y] under [AEDPA] is [even] more difficult." Id.; see also Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011). As the Supreme Court has reminded us, "[t]he standards created by Strickland and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is 'doubly'" deferential. Richter, 562 U.S. at 105 (citations omitted) (first quoting Strickland, 466 U.S. at 689 and then Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). In sum, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable -- a substantially higher threshold.'" Knowles, 556 U.S. at 123 (quoting Schriro v. Landrigan, 550 U.S. 465, 478 (2007)).

### D. Reasonable Application of Strickland

Strickland more or less repeats the arguments from his motion for a new trial, contending -- in ways similar to his averments about the excluded evidence -- that his trial counsel

was ineffective because: (1) a child abuse expert could have informed the jury that Holli suffered from MSBP, which led her to abuse Haleigh and to deceive others (including Strickland) about the abuse; (2) doctors often miss an MSBP diagnosis; and, perhaps most importantly, (3) fathers in MSBP families "are typically ignorant of what is really happening to the abused child." All of this evidence could, as we have heard from Strickland already, demonstrate how his ignorance was reasonable and provide the jury with corroborative evidence to bolster his testimony. Because the evidence would have been helpful and because trial counsel did not research or discuss MSBP or "consult[] with a child abuse expert of any kind," despite being aware of and having some discovery from the civil suit which produced the expert opinions on MSBP, Strickland portends his trial counsel neither made a "complete investigation" nor "made reasonable professional judgments." Without any investigation, Strickland alleges his trial counsel could have "made no affirmative decision to pursue a defense or strategy" to which we should grant deference.

What Strickland fails to do is to overcome our doubly deferential review by explaining how the MAC unreasonably applied Strickland when concluding trial counsel met the mark. Richter, 562 U.S. at 105. Because the MAC concluded Strickland's trial counsel was not constitutionally deficient (the first ineffective

assistance of counsel prong), we will start there.  See Strickland, 23 N.E.3d at 150.

To resolve whether trial counsel was constitutionally deficient, the Supreme Court instructs courts that "strategic choices made [by trial counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  Even "strategic choices made after less than complete investigation" are often "reasonable" so long as counsel made a "reasonable decision that makes . . . investigations [into that topic] unnecessary."  Id. at 690-91.  Regarding hiring experts, the Supreme Court has noted that "[r]are are the situations" where courts will find counsel ineffective for making "tactical decisions" about hiring or even "for failing to consult or rely on experts."  Richter, 562 U.S. at 106.  Decisions about "whether to call a particular witness [are] almost always strategic," thus requiring our deference, Hensley, 755 F.3d at 737 (quoting Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004)), because "[a]n attorney need not pursue an investigation that would be fruitless," Richter, 562 U.S. at 108.

As summarized earlier, the MAC reasoned that expert reports prepared to demonstrate how Holli deceived health care workers would not also provide evidence that she similarly deceived Strickland.  Strickland, 23 N.E.3d at 150.  In fact, as the MAC addressed, Dr. Chabon's report pointed out how mothers can act

- 33 -

"dramatic[ally]" different in "public" than they would at home where the abuse is not always hidden.  Id. at 149.

The MAC also outlined how "trial defense counsel had informed appellate counsel that he had considered MSBP at the time of trial and concluded it was not relevant" to a defense trying to pin the blame on Holli.[21]  Id. at 150.  Far from having ignored evidence about MSBP, then, trial counsel strategically decided against putting forward evidence of Holli's MSBP after establishing, in the MAC's words, it would not have "been [of much] relevan[ce] in assessing [Strickland's] role in the abuse."  Id.  The evidence "would not have exculpated [Strickland] as it does not directly contradict the eyewitness testimony that the defendant was present and partook in the violent acts against Haleigh."[22]  Id.

_____

[21]  Remember AEDPA requires that we presume such factual findings to be correct.  See Kirwan v. Spencer, 631 F.3d 582, 584 n.1 (1st Cir. 2011) (citing 28 U.S.C. § 2254(e)(1)).

[22]  The MAC references the expert report on MSBP which notes that the "family constellation typically includes fathers who are 'away at work' a great deal and are completely oblivious." Strickland, 23 N.E.3d at 149.  But in concluding Strickland's counsel was not ineffective, the MAC did not directly rely on this portion of the report.  We note that the record provides additional support for why Strickland's counsel may have felt an MSBP expert would not have helped.  It is not obvious Strickland qualifies as one of those "oblivious" or absentee fathers susceptible to deception by cases of MSBP.  The expert reports provide no hint that child abuse experts would have testified to Strickland qualifying as such a father or that the jury would have believed as much (he worked a nine-to-five, but, by his own testimony, Strickland was a present and active father who loved Haleigh).

- 34 -

Where the MAC has determined that there was a reasonable explanation for trial counsel's reasonable strategic decisions about whether to consult or to call a specific witness, and where Strickland has not provided any concrete assertions why the MSBP evidence would have aided his defense, we cannot say the MAC unreasonably applied the Strickland ineffective assistance of counsel standard. See Richter, 562 U.S. at 105. This is certainly not one of those rare cases where we would consider trial counsel's choice not to call an expert to be constitutionally deficient. See id. And, remember, we must give double deference to the MAC's choices about ineffective assistance of counsel claims, especially when "'fairminded jurists could [not] disagree on [the] correctness'" of the MAC's application of federal law. Ayala, 576 U.S. at 269 (quoting Richter, 562 U.S. at 101 (second alteration in original)).

## Conclusion

The district court's dismissal of the habeas petition is **<u>affirmed</u>**.